[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 30, 2001
THOMAS K. KAHN
CLERK

_____

No. 95-4445

_____

D.C. Docket No. 93-00597-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MERCEDES NOVATON, HUMBERTO
RODRIGUEZ, a.k.a. Chino Rodriguez, et al.,

Defendants-Appellants.

_____

No. 98-4988

_____

D.C. Docket No. 93-00597-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

OSCAR CUNI,

Defendant-Appellant.

_____

No. 98-5045

_____

D.C. Docket No. 93-00597-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAMON ROSELL, a.k.a. Papito, OSCAR CUNI, et al.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(October 30, 2001)**

Before ANDERSON, Chief Judge, CARNES and OAKES[*], Circuit Judges.

_____

[*]Honorable James L. Oakes, U.S. Circuit Judge for the Second Circuit, sitting by designation.

2

CARNES, Circuit Judge:

Appellants Francisco Novaton, Oscar Cuni, Jorge Lopez, Reynaldo Rodriguez, Mercedes Novaton, Leopoldo Rodriguez, Felipe Matamoros, Ramon Rosell, and Humberto Rodriguez were convicted of various drug-related crimes that took place in 1993. They appeal, raising numerous issues regarding their convictions and sentences. We reverse the conviction of Ramon Rosell based on his involuntary absence from critical portions of the trial, and we also remand the case involving Reynaldo Rodriguez in order for the district court to attempt to reconstruct some missing exhibits of the record that apparently relate to one of his contentions. Otherwise, we affirm all of the convictions and sentences.[1]

## I. BACKGROUND

### A. FACTS

In September 1993, the Drug Enforcement Administration and the Miami Police Department learned of a cocaine distribution operation in which kilogram-sized bricks of cocaine were being sold from a duplex in Miami. Investigators discovered that Appellant Mercedes Novaton was the record owner of the duplex,

---

[1]The nine appellants have raised a plethora of issues related to their convictions and sentences. We have carefully considered all of their arguments, but some do not merit any discussion. We summarily reject all of those arguments that are not mentioned in this opinion.

and that she lived there with her husband Appellant Francisco Novaton, her mother, and two teenage children.

On October 5, 1993, investigators installed video surveillance equipment across the street from the Novaton residence. Later in October 1993, the agents investigating the Novaton residence obtained authority to intercept wire communications on various telephones used by people who were suspected of participating in the conspiracy to distribute cocaine. During the course of the investigation, the agents monitored over 7,000 telephone calls (approximately 4,000 of which were transcribed). During many of the telephone calls, the co-conspirators used code words when referring to cocaine or to money.

By monitoring the intercepted conversations and by conducting other surveillance, the investigators learned that several co-conspirators were engaged in the distribution of cocaine through various houses in Miami, including the Novaton residence. The agents also learned that two Miami police officers were involved in the cocaine operation. Surveillance showed that Officers Jorge Lopez and Reynaldo Rodriguez, both of whom are appellants in this case, made frequent visits to the residence (sometimes several times per day). The surveillance camera showed that police cars would drive by the residence throughout the day, and would slow down as they passed. The Novaton residence also received calls from

4

a telephone within the Miami Police Department located in a unit adjacent to Jorge Lopez's office.

By monitoring intercepted conversations, the agents were able to obtain information concerning the timing of certain drug transactions, and, on several occasions, the agents seized drugs from purchasers after they left the Novaton residence. On October 23, 1993, Appellant Ramon Rosell was observed bringing three kilograms of cocaine to the Novaton residence. The agents then followed two purchasers named "Tuna" and Jamie Jones after they left the Novaton residence carrying a brown paper bag. The agents stopped Jones' vehicle, and seized the package containing three kilograms of cocaine. Following this arrest, Mercedes Novaton called Francisco Novaton, who was at a race track with Officers Rodriguez and Lopez, to tell him that Jones had been "caught with three." At that point, Novaton returned to his residence with the two police officers. The video surveillance showed that Officer Lopez then walked up and down the street in front of the Novaton residence. Lopez also called to find out information concerning the company that had towed the seized car.

On October 26, 1993, the agents learned of another cocaine transaction that was about to take place at the Novaton residence. After the purchaser left the Novaton residence, the agents followed him to a different, nearby residence. The

agents searched the house, after obtaining consent, and found four kilograms of cocaine. Shortly thereafter, the agents intercepted telephone calls in which Francisco Novaton discussed this seizure with a co-conspirator. Officer Lopez called the Miami Police Department on that day and asked for a check of police activity at the Novaton residence.

On November 1, 1993, agents intercepted a telephone conversation between Appellant Humberto Rodriguez and Francisco Novaton in which Novaton asked Rodriguez to bring over "two cousins" and "two nieces." In a call on the following day, Novaton and Rodriguez discussed "the green stuff" and "lettuce." The agents testified that these were coded references to cocaine and to money.

On November 6, 1993, the agents monitoring the Novaton residence received information about another impending transaction. They observed an individual named Jose Verona arrive in a pickup truck at the Novaton residence. Afterwards, Appellant Felipe Matamoros left the residence for a few minutes and then returned with a white bag. Appellant Leopoldo Rodriguez also arrived at the Novaton residence at about the same time, and he too was carrying a white bag. Matamoros and Rodriguez placed these bags in Verona's truck, and Verona left the Novaton residence. Verona returned home, and took both bags into his house. He then got back into his truck with one of the bags and drove away. After observing

6

this activity, the agents had the police stop Verona, ostensibly for speeding, and discovered eight kilograms of cocaine in the bag he had.

On November 9, 1993, the agents monitored a telephone conversation between Mercedes Novaton and Officer Reynaldo Rodriguez, in which Novaton asked for information about the November 6 seizure. Rodriguez then came to the Novaton residence with information concerning it.

Investigators learned during the course of the investigation that Appellant Oscar Cuni, who was the owner of a bar named the "Bowl Bar," was a primary supplier for the cocaine operation run from the Novaton residence. On October 31, 1993, the agents intercepted a telephone conversation in which Cuni called to discuss Novaton's purchase of sixty-five kilograms of cocaine (referred to as a "fifteen year old niece" and a "fifty year old grandmother"). Four days later, Cuni was observed leaving the Novaton residence and driving to a different house. Agents observed Cuni removing a box and bag from his car which he gave to some people he met in front of the house. The box and bag were placed in the trunk of the individuals' car. At that point, Cuni appeared to sort and count money in the trunk of the car.

On several occasions, Officers Lopez and Rodriguez were observed providing escorts to individuals who were coming or going from the Novaton

residence. On one occasion, a conversation between Cuni and Francisco Novaton was intercepted in which Cuni informed Novaton that he did not need protection from Officer Lopez on that particular day.

Officer Rodriguez also took steps on at least one occasion to determine whether the Novaton organization was under investigation. On November 17, 1993, he made a report of phantom drug delivery by other individuals in an effort to identify the undercover cars used by the police to investigate suspected drug deals.

On November 20, 1993, Officers Rodriguez and Lopez again demonstrated their involvement in the conspiracy. On that day, surveillance and wire intercepts suggested that an individual named Junior Ayala planned to go to the Novaton residence to pick up drug proceeds from an earlier delivery. After departing, Ayala called Mercedes Novaton and informed her that he sensed that he was being followed, and had abandoned the car with the drug proceeds still in it. Novaton called her husband and Officers Lopez and Rodriguez to come help. Ayala and the proceeds were eventually successfully recovered and returned to the Novaton residence by the officers. That night, Rodriguez was treated to free food and drinks (and allegedly prostitutes) by Cuni at his Bowl Bar. The government

8

contends that Rodriguez admitted in a post-arrest statement that he knew Ayala's car contained drug proceeds, but Rodriguez denies having made such a statement.

In the early morning hours of December 13, 1993, the agents executed a search warrant on the Novaton residence. Francisco and Mercedes Novaton were in the house. The agents found a scanner tuned to police frequencies on which they could hear the communications of fellow officers who were searching other locations in connection with this investigation. The agents also located 4.1 grams of cocaine in the Novaton residence.

## B. PROCEDURAL HISTORY

On May 27, 1994, a federal grand jury returned a 15-count, second superseding indictment charging these nine appellants and eight other defendants with various drug-related offenses. The indictment charged all of the defendants with conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846 (Count 1). Francisco Novaton and Cuni were charged with operating a continuing criminal enterprise in violation of 21 U.S.C. § 848 (Count 2). Francisco Novaton, Lopez, Reynaldo Rodriguez, Rosell, Mercedes Novaton, Humberto Rodriguez, Matamoros, and Leopoldo Rodriguez were charged with possession of cocaine with intent to distribute on October 23, 1993, in violation of

9

21 U.S.C. § 841(a)(1) (Count 3), and the Novatons, Humberto Rodriguez, Leopoldo Rodriguez, and Matamoros were charged with committing that same crime on October 26, 1993 (Count 4). Those appellants were also charged, along with Cuni, with possession of cocaine with intent to distribute on October 31, 1993 (Count 5). The Novatons, Lopez, and Reynaldo Rodriguez were charged with possession of cocaine with intent to distribute on November 6, 1993 (Count 6). Francisco Novaton and Leopoldo Rodriguez were charged with possession of cocaine with intent to distribute on November 7, 1993 (Count 7). Francisco Novaton was charged with possession of cocaine with intent to distribute on November 18, 1993 (Count 8). Lopez and Reynaldo Rodriguez, the two Miami police officers who are appellants, were each charged with knowingly carrying a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1) (Counts 9 and 10). The indictment also charged some defendants who are not appellants in some of those counts and also in several additional counts. Finally, the indictment included 17 forfeiture counts against these appellants and other defendants.

The appellants were tried jointly beginning on September 28, 1994 and ending on November 21, 1994. During the trial, the district court granted some of their motions for acquittal on certain counts of the indictment. On December 15,

10

1994, after 16 days of deliberations, the jury returned the following verdict as to

the appellants:

Francisco Novaton: guilty on Counts 1-7;

Oscar Cuni:  guilty on Counts 1 and 5, not guilty on Count 2;

Jorge Lopez:  guilty on Counts 1, 3-6, and 9;

Reynaldo Rodriguez: guilty on Count 1, not guilty  on Counts 3, 6, and 10;

Mercedes Novaton: guilty on Counts 1 and 3-6;

Ramon Rosell: guilty on Counts 1, 3, and 5;

Humberto Rodriguez: guilty on Counts 1 and 5, not guilty on Counts 3 and

4;

Leopoldo Rodriguez: guilty on Counts 1, 3, and 7;

Felipe Matamoros:  guilty on Count 1, not guilty on Counts 3-5.

Thus, all of the appellants were convicted of the conspiracy count (Count 1), and

all except Reynaldo Rodriguez and Matamoros were convicted on additional

counts.

Following sentence hearings, the district court sentenced the appellants as

follows:

Francisco Novaton:  360 months of imprisonment on each count to run

concurrently, five years of supervised release as to Count 2, eight years of

supervised release as to Counts 3 and 4, and ten years of supervised release as to Counts 1, 5, 6, and 7, all to run concurrently;

Oscar Cuni: life imprisonment, ten years of supervised release as to each count to run concurrently;

Jorge Lopez: 235 months of imprisonment as to Counts 1 and 3-6, to run concurrently, five years of supervised release as to those counts, sixty months of imprisonment as to Count 9 to run consecutively, and three years of supervised release as to that count;

Reynaldo Rodriguez: 292 months of imprisonment, five years of supervised release as to Count 1;

Mercedes Novaton: 235 months of imprisonment as to each of Counts 1 and 3-6, to run concurrently, five years of supervised release as to each count, to run concurrently;

Ramon Rosell: 235 months of imprisonment as to Counts 1, 3, and 5, to run concurrently, five years of supervised release as to Counts 1 and 5, and four years of supervised release as to Count 3, to run concurrently;

Humberto Rodriguez: 262 months of imprisonment as to Counts 1 and 5, to run concurrently, five years of supervised release as to each count, to run concurrently;

Leopoldo Rodriguez: 235 months of imprisonment as to Counts 1, 3, and 7, to run concurrently, five years of supervised release as to Counts 1 and 7, and four years of supervised release as to Count 3, to run concurrently; and

Felipe Matamoros: 292 months of imprisonment as to Count 1, ten years of supervised release.

Each of the appellants filed a timely notice of appeal challenging his or her conviction and/or sentence.

## II.  DISCUSSION

### A.  CUNI'S MOTION TO SUPPRESS WIRETAP EVIDENCE

The first issue that we will discuss is whether certain evidence obtained from court-authorized wiretaps should have been suppressed by the trial court. Although several of the defendants filed motions to suppress in the district court, only Appellant Oscar Cuni presses this issue on appeal.  He argues that the wiretap evidence should have been suppressed on Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978), grounds because the affidavits used to obtain court authorization for the wiretaps contained material misrepresentations and omissions.

The affidavits at issue were made by DEA Special Agent Lee Lucas in support of eight different applications for wiretaps, two of which were on cell

13

phones possessed by Cuni. As grounds for probable cause, these affidavits explained that Francisco Novaton had been arrested for various drug-related offenses in the past, and that there was no record of his having been employed in the previous two years. The affidavits also stated that the video camera installed outside of the Novaton residence recorded vehicles coming and going frequently from the Novaton residence during the day and evening, and various individuals with past narcotics convictions, including Cuni, frequenting the residence.

Furthermore, Lucas' affidavits contained information purportedly received from four confidential sources which confirmed narcotics activity at the Novaton residence. The affidavits explained that court-authorized trap and trace and pen register equipment indicated that the Novatons made or received over 2,500 telephone calls in the preceding month, including numerous calls to Juan Ignacio Novaton, an individual with an extensive drug-related criminal history, and to Touchdown Realty, a business suspected of having narcotics connections.

Finally, the affidavits indicated that two Miami police officers, Lopez and Reynaldo Rodriguez, were suspected of facilitating the drug operation. The video camera recorded the frequent arrival and departure of police cars at the residence, and showed that police cars frequently drove past the house and slowed down.

Also, the Novaton residence had received telephone calls from a Miami Police Department telephone adjacent to Lopez's office.

After Cuni and several other defendants filed their motion to suppress on Franks grounds, a magistrate judge conducted an evidentiary hearing over the course of eleven days. Cuni and the others attacked the information provided by and about the confidential sources cited in the affidavits. In particular, Cuni pointed out that Agent Lucas failed to disclose that one of the three confidential sources who provided information about Cuni had been married to Cuni's wife, was extremely jealous of Cuni, and had engaged in stalking. Furthermore, Cuni argued that two of the informants were business rivals of his. Cuni also argued that Agent Lucas' affidavits were insufficient because they did not disclose adequate information about the informants' criminal histories, including the fact that one of the informants had been convicted of lying to the police. Finally, Cuni argued that Agent Lucas' affidavits misrepresented Cuni's criminal history as "extensive" and had erroneously attributed to him a prior cocaine conviction, when in fact that prior conviction involved heroin.

Following the hearing, the magistrate judge recommended that the motion to suppress be denied. She found that the information provided by the confidential sources was sufficiently corroborated by other evidence, and that any omissions

15

concerning animus on the part of the informants, benefits provided to the informants, or the prior criminal record of the informants were immaterial. The magistrate judge noted that a reviewing magistrate is aware that confidential informants "often are characterized by deal-making, [bad] motive and suffer from generally unsavory character," and that, even in the absence of allegations to that effect in an affidavit, courts take those factors into consideration in determining whether probable cause exists. Furthermore, the magistrate judge found that the description of Cuni's criminal history as "extensive" was not inaccurate and that the mischaracterization of Cuni's conviction as cocaine-related, when it was actually heroin-related, was immaterial. The district court adopted the magistrate judge's report and recommendation, agreed with each of her findings, and denied the motions to suppress.

Following his conviction, Cuni moved for a new trial and renewed his motion to suppress the wiretap evidence used against him. He reasserted the grounds contained in his pretrial suppression motion, and also argued that trial testimony and post-trial statements from certain of the informants cited in Agent Lucas' affidavits supported his motion. In particular, Cuni submitted affidavits from investigators and attorneys for Cuni and Novaton who stated that two of the informants had agreed to speak with them after the trial, and that those two

16

informants denied having provided much of the information attributed to them in Agent Lucas' affidavits and stated that little if any of the information provided to the agents was based on their personal knowledge.

The magistrate judge conducted a three-day Franks hearing in response to the post-trial motion, after which she recommended denying Cuni's motion. The district court adopted the magistrate judge's report and recommendation and denied the motion for a new trial.

On appeal, Cuni contends that the district court erred by not suppressing the wiretap evidence against him for four reasons. First, he argues that the affidavits contained material misrepresentations concerning the past cooperation and reliability of the informants. Agent Lucas' affidavits contained the following representation (almost identical in all of the affidavits):

> [The law enforcement officers conducting the investigation] have received information from four (4) separate confidential sources (CSs) pertaining to a narcotics smuggling distribution organization . . . . In addition, the information provided by the CSs has proven reliable in the past. . . . CSs information has been corroborated by surveillance and police record checks.

Cuni asserts that this statement is false because three of the four informants had not cooperated with the police in the past. He argues that the misrepresentation must have been deliberate because the wiretap applications were filed between October

17

19, 1993 and December 1, 1993, while Agent Lucas testified that two of the informants only began providing information in September and October 1993.

Second, Cuni argues that the statement attributed to one of the informants was contradicted by that individual's testimony at trial. The affidavit stated that the informant had observed Cuni unloading boxes from a van at the Novaton residence under the supervision of a police officer. The informant retreated from that statement during his trial testimony.

Third, Agent Lucas' affidavit, dated November 16, 1993, supporting the application for a wiretap on one of Cuni's cell phones erroneously represented that Cuni had a prior conviction for cocaine trafficking, although the previous conviction actually related to heroin.

Finally, Agent Lucas' affidavits omitted facts concerning the criminal histories of the informants, including the fact that one of the informants had previously been convicted of lying to a police officer. Based on these alleged misrepresentations or omissions, Cuni argues that the district court erred by not suppressing the wiretap evidence.

We review the district court's findings of fact on a motion to suppress only for clear error, but review its application of law to those facts de novo. United States v. Jackson, 120 F.3d 1226, 1228 (11th Cir. 1997). In the present case, the

18

district court's findings of fact were not clearly erroneous, and the court did not err in denying Cuni's motions to suppress.

In Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978), the Supreme Court set out the standards for considering an attack on the veracity of an affidavit filed in support of a search warrant. The Court stated that:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

Franks, 438 U.S. at 171-72, 98 S. Ct. at 2684-85. "In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one

19

side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." Id. at 156, 98 S. Ct. at 2676.

Of the four alleged deficiencies with Agent Lucas' affidavits, three involve affirmative misrepresentations and one involves omissions. In order to be entitled to relief, Cuni must carry his burden of proving (1) that the alleged misrepresentations or omissions were knowingly or recklessly made by Agent Lucas, and (2) that the result of excluding the alleged misrepresentations and including the alleged omissions would have been a lack of probable cause for issuance of the warrants. United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir. 1990). Cuni has failed to carry that burden.

The first alleged misrepresentation pointed to by Cuni relates to the statement in the affidavits to the effect that the four informants who provided information in support of probable cause had proven reliable in the past. Cuni asserts, and the government does not dispute in its briefs to us, that three of the four informants had never before cooperated with law enforcement officials. Cuni argues that this misrepresentation was inherently false and made with reckless disregard for the truth in light of Agent Lucas' subsequent testimony about when

the informants began cooperating.  The government responds that just because the informants had not cooperated in the past does not mean that the information they provided in connection with this case was unreliable.  It also maintains that the misrepresentation was not material to the district court's finding of probable cause and that Cuni did not show that the representation was knowingly or deliberately included in the affidavit.

We find troubling Agent Lucas' apparent misrepresentations concerning the past cooperation of the informants involved in this case.  Although the government maintains that there was an absence of proof concerning the agent's deliberateness or recklessness in making the misrepresentations, it is unclear how Agent Lucas could have made such statements of an affirmative character for which there was no basis without having acted either deliberately or recklessly.  Accordingly, we will assume that this was a deliberate or reckless misrepresentation.

However, Cuni's argument stumbles on the second-step of the Franks test. The Supreme Court made it clear in Franks that in order to be entitled to relief a defendant must show not only that misrepresentations or omissions were intentionally or recklessly made, but also that, absent those misrepresentations or omissions, probable cause would have been lacking.  That is the test of materiality,

and materiality is essential no matter how deliberate or reckless the misrepresentations were.

We do not believe that the statements concerning the past reliability of the informants, when viewed in the context of all the information contained in the affidavits, were material. Agent Lucas' affidavits contained extensive factual detail which was independent of the informants' statements and that supported probable cause. Although the magistrate judge did not directly address the alleged misrepresentations about past use of the informants, she did discuss whether there was sufficient corroboration of the informants' statements, and found there was. The district court agreed and adopted the magistrate judge's recommendation, and those findings of corroboration are not clearly erroneous. Under these circumstances, even assuming Agent Lucas' statements concerning the informants' past reliability were deliberately false and subtracting those statements from the affidavits, there was still ample showing of probable cause in the affidavits.

Cuni's second argument, that the statement attributed to one of the informants was contradicted by that individual's testimony at trial, fares no better. The affidavit stated that the informant had observed Cuni unloading boxes from a van at the Novaton residence under the supervision of a police officer, but in his trial testimony, the informant retreated from that statement. However, the mere

fact that an informant's trial testimony contradicts information attributed to that informant in an affidavit supporting a warrant does not entitle a defendant to suppression. Instead, the defendant must show that it is the agent, and not the informant, who has made misrepresentations. On this point, the magistrate judge heard testimony from another agent corroborating Agent Lucas' account of the information learned from the informants. Thereafter, the magistrate judge made factual findings, subsequently adopted by the district court, accepting the agents' version of their conversations with the informants. The court also found that "Cuni ha[d] failed to show that Agent Lucas either lied or recklessly presented false testimony in the wiretap affidavit." In light of the record and the superior opportunity of the magistrate judge to make credibility findings, we cannot say that these findings were clearly erroneous.

Next, we turn to the <u>Franks</u> challenge based on the erroneous statement by Agent Lucas in his affidavits that Cuni had a previous cocaine-related conviction, when in fact Cuni's prior conviction related to heroin. We agree with the district court that this error was completely immaterial to the finding of probable cause for the wiretaps. Cuni's argument to the contrary is frivolous.

Finally, Cuni argues that Agent Lucas should have included in his affidavits information concerning possible animus between the informants and Cuni as well

23

as details about the informants' criminal histories, including the fact that one of the informants had previously been convicted of lying to a police officer. The magistrate judge and district court found these alleged omissions did not entitle Cuni to suppression. With respect to the failure to provide information concerning possible animus, the district court observed that "judges are accustomed to dealing with information derived from informants, and are well aware that such information is often obtained in the context of personal rancor and mixed motives." The court also noted that the agents had corroborated much of the information provided by the informants, thereby making the failure to inform the court of animus less material.

Similarly, the magistrate judge noted that the failure to perform more thorough reviews of the informants' criminal histories was a result of the fact that the investigation implicated Miami police officers, and, consequently, the agents involved were cautious not to call attention to the informants by digging into their criminal records. The magistrate judge, therefore, found that the failure to discover and disclose aspects of the informants' criminal histories was not "an omission made with reckless disregard." The district court adopted this finding. We conclude that, under the facts of this case, the district court did not clearly err by finding that Cuni had failed to carry his burden of showing that the alleged

24

omissions relating to the informants' criminal histories were either deliberate or reckless. Furthermore, in light of the other facts contained in the affidavits, the alleged omissions were immaterial to a finding of probable cause for the wiretaps. Therefore, Cuni's <u>Franks</u> challenge fails.

## B. REYNALDO RODRIGUEZ'S MOTIONS TO SEVER

Reynaldo Rodriguez, a former Miami police officer, contends that the district court erred by denying his motion, made pursuant to Fed. R. Crim. P. 14, to sever his trial from that of his co-defendants. The ground urged in the motion was that separate trials were needed so that Rodriguez could obtain and utilize the testimony of co-defendants Francisco Novaton and Cuni. The district court referred the motion to a magistrate judge who recommended that it be denied without prejudice. Rodriguez filed objections to that report and recommendation and filed a renewed motion for severance. That renewed motion was supported by affidavits from Francisco Novaton and Cuni. After reviewing the Novaton and Cuni affidavits, the district court found that severance was not justified because the affidavits did not contain specific, exonerative facts and because the interest of judicial economy and preference for trying co-defendants together outweighed any

prejudice to Rodriguez. Rodriguez again moved for severance during the trial, and the district court again denied his motion.

Motions for severance are governed by Rule 14 of the Federal Rules of Criminal Procedure. That rule "requires a trial court to balance the rights of the defendants and the government to a trial that is free from the prejudice that may result from joint trials against the public's interest in efficient and economic administration of justice." United States v. Pepe, 747 F.2d 632, 649 (11th Cir. 1984). "Nevertheless, because of the well-settled principle that it is preferred that persons who are charged together should also be tried together, particularly in conspiracy cases, the denial of a motion for severance will be reversed only for an abuse of discretion." United States v. Cobb, 185 F.3d 1193, 1197 (11th Cir. 1999) (citation and quotation omitted). Furthermore, "[a]ppellate courts are reluctant to second-guess trial court refusals to grant a severance," and therefore, in order to show an abuse of discretion, a defendant must satisfy the "heavy burden" of demonstrating "compelling prejudice" from the denial of a motion to sever. Pepe, 747 F.2d at 650-51; see also Cobb, 185 F.3d at 1197 (noting that defendant must show "specific and compelling prejudice" in order to justify severance).

This Circuit's framework for analyzing a motion to sever is well-established. We have recognized that a defendant first must demonstrate:

26

> (1) a bona fide need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the codefendant would indeed have testified at a separate trial.

Cobb, 185 F.3d at 1197 (citations and quotations omitted).  See also United States v. DeSimone, 660 F.2d 532, 539 (5th Cir. Unit B 1981) (same);  Byrd v. Wainwright, 428 F.2d 1017, 1019-20 (5th Cir. 1970).  If a defendant makes such a showing, then:

> [A] court must still (1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider judicial administration and economy; and (4) give weight to the timeliness of the motion.

Cobb, 185 F.3d at 1197 (citations and quotations omitted).  See also DeSimone, 660 F.2d at 540 (same).  It is within this framework that we review whether the district court properly denied Rodriguez's motions for severance.

This Court's cases addressing severance motions have often looked hard at the substance of the affidavits proffered by the co-defendant who purportedly would testify in a separate trial.  For example, in Pepe, the Court considered the effect of affidavits proffered by a co-defendant of Albert "Chink" Facchione in which the co-defendant stated that he could testify that Facchione had not conspired with him to carry out the act charged in the indictment and had not, to

27

his knowledge, engaged in wrongdoing. Pepe, 747 F.2d at 650. After reviewing

the proffered testimony, the Court concluded that:

> [The testimony] consisted almost exclusively of bare exculpatory
> denials, devoid of any specific exonerative facts. . . . [T]he testimony
> was of dubious credibility because it was in no way contrary to [the
> co-defendant's] own interests. Moreover, judicial economy weighed
> heavily against severance in this complex case. We thus conclude that
> Facchione failed to carry his "heavy burden" of showing "compelling
> prejudice" and that the district court did not abuse its discretion in
> refusing to sever his case.

Id. at 651 (emphasis added, footnote omitted). See also DeSimone, 660 F.2d at

540 (denying motion where affidavits contained no "specific and exonerative

facts," but instead only self-serving, conclusory allegations). Therefore,

statements concerning the testimony that would become available by severing trials

must be specific and exonerative, rather than conclusory or self-serving, in order to

justify severance.

This point is borne out in those cases in which we have found failure to

sever to be an abuse. In United States v. DiBernardo, we held that a district court

correctly granted a motion to sever where a co-defendant proffered an affidavit

stating he would testify that he had acted alone with regard to much of the charged

criminal activity, and that the defendants who were seeking severance had no

knowledge of his actions. 880 F.2d 1216, 1228 (11th Cir. 1989). We noted that

such evidence incriminated the affiant and was significant to the defense because it

28

would have specifically rebutted a crucial element of the prosecution's case. Id.; see also Cobb,185 F.3d at 1198-99 (finding an abuse of discretion where a co-defendant would have testified that he had not shared the proceeds of a bank robbery with the defendant, and where only evidence against defendant was testimony by a witness who allegedly saw defendant receive share of proceeds).

Our review of the affidavits submitted in support of Rodriguez's motion convince us that they do not contain the type of specific and exonerative facts which would establish that the district court abused its discretion in denying the motions. Almost all of the statements contained in the affidavits by Novaton and Cuni consist of conclusory denials of the charges in the indictment. For example, one such statement reads that Novaton would testify "[t]hat REYNALDO RODRIGUEZ did not conspire with me, or to my knowledge with anyone else, to possess with intent to distribute cocaine at any time in 1993, as alleged in Count One of the Superseding Indictment in this case." This is precisely the type of self-serving statement which we have found to be insufficient to show "compelling prejudice" requiring a new trial.

Other than conclusory statements, which are neither contrary to the affiants' penal interests nor contain any other indicia of credibility, the only factual statement contained in either affidavit is one statement by Novaton attempting to

29

explain the frequency of Rodriguez's visits to the Novaton residence.  Novaton's affidavit says  "[t]hat on the occasions when REYNALDO RODRIGUEZ visited my residence . . . in 1993, he did so to eat, use the bathroom facilities, engage in Santeria worship, and for other personal reasons.  He did not engage in any illegal narcotics activity in my residence at any time."  This lone statement in no way incriminates the affiant, and it does not present the type of "specific and exonerative" facts necessary to require a severance.  We hold that  the district court did not abuse its discretion by denying Rodriguez's motions for severance, particularly in light of the substantial systemic interest in handling this complex, conspiracy case in one trial (which lasted two months).

## C.  REYNALDO RODRIGUEZ'S RULE 806 MOTION TO ADMIT CO-DEFENDANTS' AFFIDAVITS IN ORDER TO IMPEACH CO-CONSPIRATOR HEARSAY STATEMENTS

Reynaldo Rodriguez also contends that the district court erred by not permitting him to introduce the Novaton and Cuni affidavits submitted in support of his motions for severance as evidence at trial in order to impeach co-conspirator hearsay statements by them which were admitted.  Rodriguez argues that the affidavits were admissible under Fed. R. Evid. 806, which provides that:

30

When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E) [which includes co-conspirator statements], has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified at trial as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

Fed. R. Evid. 806 (bracketed material added).

The government responds that the affidavits were not admissible under Rule 806 because they were not inconsistent with any of the co-conspirator statements admitted at trial. Although acknowledging that numerous co-conspirator statements were admitted, mostly in the form of taped conversations from the wiretaps, the government argues that those statements were not admissions of Rodriguez's complicity in the co-conspirators' crimes, but instead were statements that were part of the commission of the conspiracy and other underlying crimes. Because, it contends, no inconsistent statements were admitted, there was nothing to be impeached by the affidavits.

After the parties presented oral arguments in this case, we requested that Rodriguez provide the Court with supplemental briefing on the Rule 806 issue providing us with record cites to the co-conspirator statements admitted at trial

31

which, in his view, would have been impeached by the Novaton and Cuni affidavits that he sought to have admitted. While attempting to respond to our request, Rodriguez discovered that although approximately 100 tape recordings (primarily of conversations intercepted by wiretaps) and accompanying transcripts and translations had been introduced as exhibits at trial, none of those exhibits were included in the record on appeal.

After we were informed by Rodriguez that the record on appeal was incomplete, we ordered the parties to discuss the missing portions of the record, and to tell us about the status of the record. In response, we were informed by Rodriguez that neither the district court clerk's office, nor our clerk's office, knew where the missing trial exhibits were. Rodriguez further indicated that the United States Attorney's Office was unaware of the location of the tapes and transcripts, and did not have duplicates of those trial exhibits, although the DEA apparently had at least some duplicate tapes, but no transcripts.

Although Rodriguez's counsel attempted to reconstruct some of the missing transcripts based on records he had, the Assistant United States Attorneys working on this appeal were initially unable or unwilling to stipulate to the authenticity of those transcripts because they had not been involved in the trial of the case. All of the prosecutors who participated in the trial have left the United States Attorney's

Office.  After being informed of this situation, our clerk's office inquired of the district court clerk's office concerning the trial exhibits, and was informed that the voluminous trial exhibits had been returned to the United States Attorney's Office at some time after the conclusion of trial, and that the district court clerk's office had not maintained copies of the exhibits nor had it included any of the exhibits in the record on appeal.

We urged the parties to do more to solve the problem of the missing exhibits. Later, we were informed that the United States Attorney's Office had located some tapes from which the missing transcripts might be reconstructed. Hoping to avoid the necessity of an evidentiary hearing, which would obviously require a remand, we directed counsel for Reynaldo  Rodriguez and the government to meet and attempt to reach a stipulation about the contents of the missing exhibits. They made some progress but were not entirely successful.  Some reconstructed transcripts have now been submitted to us, and the counsel for Rodriguez and the government have stipulated that those transcripts are true and correct copies of some of the missing trial exhibits.  Rodriguez insists, however, that not all of the transcripts have been reconstructed and submitted to us, and apparently contends that some of the missing ones are or may be relevant to his

Rule 806 issue. Absent any basis for concluding to the contrary, we will assume for present purposes that is true.

It is against this background that we are asked to decide whether it was an abuse of discretion for the district court not to admit into evidence the two affidavits that Reynaldo Rodriguez wanted to use to impeach co-conspirator statements contained in transcripts of conversations that were admitted into evidence. In a recent case, we recognized that under some circumstances a district court's failure to admit affidavit statements which would impeach co-conspirator statements admitted at trial is reversible error. See United States v. Grant, 256 F.3d 1146, 1152-1156 (11th Cir. 2001). We held that under Rule 806, "[t]he test is whether the out-of-court statements would have been admissible for impeachment purposes had the co-conspirator statements been delivered from the witness stand by the co-conspirator himself, not as hearsay about what he said during the conspiracy but as contemporaneous in-court statements." Id. at 1154. We are loath to decide this issue without assurance that every effort, including an inquiry by the district court, has been made to reconstruct all the missing trial exhibits that are relevant to the issue.

Rule 10 of the Federal Rules of Appellate Procedure places the burden on appellants to ensure that the record on appeal is properly prepared and forwarded

to the court of appeals. However, in this case it appears that the problems with the record are not due to any lack of diligence or care on the part of Rodriguez. He made a timely request to the district court clerk's office that the entire record be included in the record on appeal. Through no fault of his own, that was not done, and the relevant trial exhibits were instead returned to the government. Also, through no fault of Rodriguez, the government subsequently misplaced those exhibits. Under these circumstances, we will not hold Rodriguez accountable for the deficiencies in the record.

We previously have considered what to do when an incomplete record on appeal is supplied to us, and have stated that "[i]f the defendant is represented by the same attorney at trial and on appeal, a new trial may be granted only if the defendant can show that the failure to record and preserve a specific portion of the trial visits a hardship on him and prejudices his appeal."[2] United States v. Medina, 90 F.3d 459, 462-63 (11th Cir. 1996). A criminal defendant's entitlement to a new trial based on the incompleteness of the record, however, is "premised upon the district court's inability to reconstruct the record." United States v. Cashwell, 950

---

[2]A somewhat more lenient standard is applied when a defendant is represented by a new attorney on appeal, and the defendant need only show that "there is a substantial and significant omission from the trial transcript." Medina, 90 F.3d at 463. In this case, however, Reynaldo Rodriguez was represented by the same attorney both at trial and on appeal, and, consequently, he would have to show hardship and prejudice in order to be entitled to a new trial.

F.2d 699, 704 (11th Cir. 1992). A reconstructed record, even if not identical to the original trial transcript and exhibits, will provide a defendant with sufficient due process as long as it "can accord effective appellate review" of the issues raised on appeal by the defendant. Id. at 703.

In this case, the district court should make findings about whether there are in fact any missing trial exhibits that are relevant to Reynaldo Rodriguez's Rule 806 issue. If it finds that there are, the district court may be able to reconstruct, as provided in Rule 10(e) of the Federal Rules of Appellate Procedure, any missing trial exhibits that are relevant to the Rule 806 issue, which Rodriguez and the government have not been able to supply through stipulation. The court should at least attempt to do so. Therefore, we will remand this part of the case involving Reynaldo Rodriguez to the district court in order for it to make findings about whether there are any missing trial exhibits that are relevant to the Rule 806 issue, and for it to attempt to reconstruct any that are relevant. See United States v. Taylor, 607 F.2d 153, 154 (5th Cir. 1979) (remanding for reconstruction of trial transcript); United States v. Preciado-Cordobas, 923 F.2d 159, 160-61 (11th Cir. 1991) (remanding for reconstruction of closing arguments).

On remand, the district court may consider whatever evidence or testimony it sees fit for these purposes. Preciado-Cordobas, 923 F.2d at 160-61. Because the

only issues remaining relate to Reynaldo Rodriguez's Rule 806 argument, the district court need only concern itself with the portions of any missing trial exhibits that contain co-conspirator statements by Cuni and Francisco Novaton which Rodriguez contends were impeached by their proffered affidavits.

Although remanding this case for findings and for a reconstruction of any relevant missing trial exhibits has the unfortunate effect of prolonging this already protracted litigation, we see no alternative which will provide Rodriguez with the due process protection to which he is entitled. Remanding the case will also give the district court an opportunity to reconsider its ruling on the Rule 806 issue in light of our Grant decision, which it did not have at the time of trial. We imply no view on whether Grant controls this case, but if the district court after reconstructing the missing transcripts and reconsidering the issue in light of Grant does decide that Rodriguez is entitled to a new trial, it should grant one.

On the other hand, if the district court finds that there are missing trial exhibits, which it cannot reconstruct, that are relevant to Reynaldo Rodriguez's Rule 806 issue, that court should decide in the first instance whether the missing exhibits prejudice Rodriguez by denying him effective appellate review within the meaning of our Medina and Cashwell decisions. Whatever the district court decides about either or both issues, the losing party may appeal. In light of that

37

possibility, specific factfindings by the district court will be appreciated by this Court.

## D.  ROSELL'S ABSENCE FROM TRIAL

Next, we turn to Appellant Ramon Rosell's contention that the district court erred by going forward with his trial even though he was absent due to health problems.  Rosell argues that the court should have either granted a continuance, severed him from the trial, or granted a mistrial in light of his absence. His position is that the court's failure to do so resulted in the violation of his rights under the Confrontation Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and Rule 43 of the Federal Rules of Criminal Procedure.  We agree.

The eight-week-long trial in this case started on September 28, 1994. Rosell was in attendance at the trial from that time up until November 10, 1994. During a break in the late afternoon of that day, Rosell became ill and collapsed in the corridor of the courthouse.  Emergency services were called, and Rosell was taken to the hospital by ambulance.  After the district court was informed about these events, the court stated that it did not want to continue with trial if Rosell was unavailable and wished to attend.  Because the evidence being presented by the prosecution at that time had nothing to do with Rosell's part of the case, however, his counsel agreed to go forward and waived Rosell's right to be present.

On November 14, the next day of trial, Rosell's counsel informed the court that Rosell initially had been hospitalized, but that he had been released an hour before the trial reconvened that day. Again because the evidence was unrelated to Rosell, his counsel waived Rosell's right to be present and requested permission to allow Rosell to stay home. The court agreed.

The next day, Rosell's counsel reported to the court that Rosell was physically unable to participate in the trial, and provided a letter to the court from Rosell's doctor concerning his condition. Rosell's counsel also consented to the government's discussing Rosell's condition with his doctor. For the first time, Rosell's counsel indicated to the court that a continuance might be necessary as portions of the trial relevant to Rosell's part of the case were about to begin. Counsel indicated that he was willing to cooperate and allow the trial to go forward with respect to matters unrelated to Rosell, but reiterated that Rosell did not waive his right to be present for aspects of the trial germane to him.

The following morning, Rosell was still absent from the trial. The government reported that it had spoken with Rosell's doctor, and that the doctor did not have enough information to know whether Rosell could attend the trial. The doctor indicated that an X-ray would be necessary in order to determine Rosell's condition. Rosell's counsel informed the court that he had difficulties

communicating with his client because of the pain which Rosell was suffering and because of his medication. Rosell's counsel moved for continuance at that point in time so that an X-ray could be taken in order to determine the severity of Rosell's condition. The district court denied the motion for continuance finding that, based on the information that it had at that time, Rosell's absence was voluntary. The court did say that Rosell could present evidence to show the contrary.

The district court also denied Rosell a two-hour continuance so that his doctor could be brought into court and questioned about Rosell's condition. The court indicated that Rosell's counsel could skip the examination of the next witness if he needed to try to get more information about his client's condition. Counsel resisted that option, however, because he had been told that information relevant to Rosell would be brought out during the cross-examination of that witness. Rosell's counsel then requested a continuance of an hour and twenty minutes so that he could go to his client's home, and attempt to bring him to the courthouse so the judge could see his condition. The court denied that request. Rosell then made a motion for a mistrial, which the district court denied.

Later that afternoon, Rosell attended the trial for approximately an hour and twenty minutes. His counsel informed the court that he and Rosell's brother had to carry Rosell into court. Counsel informed the court that Rosell felt dizzy and

40

uncomfortable as a result of the pain he suffered and the pain killers and other medications which he was taking, and that Rosell was sleeping fourteen to sixteen hours per day. Rosell's counsel also informed the court that he had been unable to have meaningful conversations with Rosell concerning the case since the day on which Rosell collapsed and was carried away by ambulance. Rosell's counsel also proffered Rosell for any questions that the judge might have concerning his condition, but the court indicated that it had no questions. Rosell confirmed under oath his counsel's representations concerning his condition and his inability to have meaningful conversations with his attorney about the case. After this presentation, Rosell's counsel informed the court that Rosell had another doctor's appointment later that afternoon, and requested a continuance until the following morning. Alternatively, he moved for a mistrial. The district court denied both motions.

On Thursday, November 17, Rosell's attorney informed the court that Rosell had been admitted to the hospital the previous evening, and that it was his understanding Rosell would be hospitalized for two or three days. The court noted that the situation was problematic, but determined that the trial should go forward given that it was the last day of evidence in an eight-week trial. The court noted

that this decision might ultimately require that a mistrial be declared. The court nonetheless denied Rosell's motion for a continuance.

Later in the day, Rosell's counsel was forced to go forward with his defense case despite his client's absence from the trial. As part of his case, Rosell's attorney called and examined several witnesses, including the government agents who had monitored the wiretaps. Rosell remained hospitalized and absent from trial that day and on the following day when his counsel closed his defense case and when closing arguments began. Again, the district court denied his counsel's motions for a continuance or a new trial.

On the following Monday, two days after the conclusion of Rosell's defense, and after closing arguments had begun, Rosell returned to court. Thereafter, the jury convicted him of all three counts with which he was charged. Rosell made a post-trial motion for a new trial based, in part, on the district court's denial of his repeated motions for a continuance or mistrial as a result of his absence. The district court denied that motion. In doing so, the court stated that even assuming Rosell's absence was involuntary, he was not entitled to a new trial because his counsel had been present at trial and there had been no showing of prejudice resulting from Rosell's absence.

1. Standard of Review

We review for clear error a district court's determination of whether a defendant's absence from trial was voluntary or involuntary. United States v. Bradford, 237 F.3d 1306, 1311 (11th Cir. 2001). "If the court properly found the right [to be present] waived, we consider whether the court abused its discretion in concluding that there was on balance a controlling public interest to continue the trial in the defendant's absence." Id. "Finally, if the court erred in continuing trial in the defendant's absence, we ask whether the error was harmless." Id. "The determination of whether a constitutional error is harmless presents a mixed question of fact and law. . . . In reviewing mixed questions of fact and law the court is free to substitute its own judgment for that of the district court." Hall v. Wainwright, 805 F.2d 945, 947 (11th Cir. 1986).

## 2. Voluntariness of Rosell's Absence

The first question which we must address in order to decide whether Rosell is entitled to a new trial because of his absence on three full days (November 15, 17, and 18) and most of a fourth day (November 16), is whether his absence was voluntary or involuntary.[3] Bradford, 237 F.3d at 1311. The parties have conflicting views on whether the district court ever answered this question. The

---

[3]We are assuming for present purposes that his counsel could and did waive Rosell's absence on the days that he said he was doing so. Rosell does not argue to the contrary. Counsel did not purport to waive his client's presence on November 15 - 18.

government points out that the district court made a finding on November 16 that, based on the evidence that had been presented, it would treat Rosell's absence as voluntary. Rosell points out that the district court assumed for purposes of his motion for new trial that the absence was involuntary.

The district court never explicitly revisited its November 16 finding that Rosell was voluntarily absent, but the court made that finding before it was provided with much information about Rosell's condition. It also made that finding before Rosell's second hospitalization, which occurred during his absence from the two days of trial while his defense was presented. It is not clear from the record that the district court found Rosell's entire absence voluntary. For example, in discussing whether to go forward without Rosell on November 17, the day that the presentation of Rosell's defense began, the district court acknowledged that a showing that Rosell was "simply unable to attend" might be possible and could result in a mistrial. At that time, the court made no mention of Rosell's absence being voluntary. Given that, we do not agree with the government that the district court found the entirety of Rosell's absence to be voluntary.

In light of the record, we are convinced that at least substantial portions of Rosell's absence were involuntary, and that any contrary finding by the district court would have been clearly erroneous. Whether Rosell was voluntarily absent

44

during the time when he was at home, but in pain and highly medicated, is a difficult issue, and if those were the circumstances surrounding the entirety of Rosell's absence, then it might be difficult for us to conclude that the district court clearly erred in finding the absence voluntary – if that is what the court did or would do. However, at least during the periods of time when Rosell was hospitalized, which included both days on which his defense was presented, we find that Rosell was involuntarily absent from court, and that any contrary finding would be clearly erroneous.

The record makes it abundantly clear, and the government does not dispute, that Rosell's ailments during the last week of his trial were real. There is no contention that this is a case in which a defendant was faking an illness or otherwise attempting to scuttle a trial. Rosell attended seven weeks of this eight-week trial, and was absent only after collapsing in the courthouse and being carried away in an ambulance. He was hospitalized twice over a ten-day period. Even after Rosell became ill, his counsel cooperated commendably with the government and the district court and only moved for a continuance, or in the alternative a mistrial, after the evidence being presented began to directly impact Rosell's part of the case. Under these circumstances, and absent further evidence, which neither

side has requested an opportunity to present, it would be clearly erroneous to find that Rosell's absence was not, at least in part, involuntary.[4]

### 3. Prejudice to Rosell

We now turn to whether the district court erred by not granting a continuance or a mistrial in light of Rosell's involuntary absence. The right of a criminal defendant to be present at trial has three bases: the Confrontation Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and Fed. R. Crim. P. 43. See United States v. Brantley, 68 F.3d 1283, 1290-91 (11th Cir. 1995) ("The right to be present during one's trial arises from the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment, and is codified at Rule 43 of the Federal Rules of Criminal Procedure.").

The right to be present pursuant to the Confrontation Clause has been referred to as a "trial right," and is less broad than the right afforded by the Due Process Clause or Rule 43. United States v. Boyd, 131 F.3d 951, 954 (11th Cir.

---

[4]Rosell's counsel's consent to the continuation of the trial when Rosell initially fell ill, and while the evidence being presented did not involve him, did not extend to November 15 - 18. Counsel repeatedly made clear to the court that any waiver of Rosell's right to be present was only effective during the portions of the trial which were unrelated to Rosell. This limited waiver obviously did not apply to the last several trial days when Rosell was absent, days during which the trial focused upon him. As we have indicated, the fact that Rosell, through counsel, was willing to waive his presence during the part of the trial that did not directly relate to him is evidence of his good faith.

46

1997).  The Supreme Court has "emphasized that a primary interest secured by the Confrontation Clause is the right of cross-examination."  Kentucky v. Stincer, 482 U.S. 730, 736, 107 S. Ct. 2658, 2662 (1987) (citation, quotation, and brackets omitted).  Thus, this clause has the "functional purpose [of] ensuring a defendant an opportunity for cross-examination."  Id. at 739, 107 S. Ct. at 2664.

The Due Process Clause, on the other hand, offers a criminal defendant a somewhat broader right to be present.  See Boyd, 131 F.3d at 954.  The Supreme Court described this right as follows:

> The Court has assumed that, even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right "to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." . . . Although the Court has emphasized that this privilege of presence is not guaranteed "when presence would be useless, or the benefit but a shadow," . . . due process clearly requires that a defendant be allowed to be present "to the extent that a fair and just hearing would be thwarted by his absence" . . . .  Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.

Stincer, 482 U.S. at 745, 107 S. Ct. at 2667 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-08, 54 S. Ct. 330, 332-33 (1934)).  Similarly, this Court has stated that "[t]he right of a criminal defendant to be present at all critical stages of his trial is a fundamental constitutional right."  Proffitt v. Wainwright, 685 F.2d 1227, 1260 n.49 (11th Cir. 1982).

47

On its face, Rule 43 seems to provide a right to be present at trial that is broader still. Subject to certain inapplicable exceptions (including voluntary absence), the rule mandates that "[t]he defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence." Fed. R. Crim. P. 43(a). Although we have noted that "Congress' intent in enacting Rule 43 was to codify then-existing case law regarding a criminal defendant's right to be present," we have declined to determine the extent to which the rule and the constitutional sources of the right to be present overlap. Boyd, 131 F.3d at 953 n.3.

It is clear under the facts of this case that the full force of each of the three sources of the right to be present – the Confrontation Clause, the Due Process Clause, and Rule 43 – bears down on the district court's decision to continue the trial in Rosell's absence. The "trial right" aimed at ensuring effective examination of witnesses provided by the Confrontation Clause is implicated given that Rosell was absent during several days of trial while witnesses gave testimony against him. The Due Process Clause's guarantee of presence during all "critical stages" of a trial applies because Rosell was absent during both the government's case-in-chief relating to him as well as the presentation of his own defense case. Stages of a trial

48

could hardly be more critical for a defendant. Finally, the portions of the trial Rosell missed were unquestionably "stages" subject to Rule 43's directive. Consequently, Rosell had a clear right to be present during the portions of the trial which were conducted over his protest in his absence, and the district court committed a constitutional and statutory error by denying him that right.

The existence of error does not end our inquiry, however, because courts have repeatedly held that the continuation of trial in absence of a defendant may be harmless. See, e.g., Finney v. Zant, 709 F.2d 643, 646 (11th Cir. 1983) ("Any error by reason of Finney's absence during trial was harmless beyond a reasonable doubt."), overruled on other grounds, Peek v. Kemp, 784 F.2d 1479 (11th Cir. 1986); Hall v. Wainwright, 805 F.2d 945, 947-48 (11th Cir. 1986) (same); Proffitt, 685 F.2d at 1260 n.49 ("[O]nce the defendant has established a violation of that right [to be present] his conviction is unconstitutionally tainted and reversal is required unless the State proves the error was harmless beyond a reasonable doubt.").[5]

_____

[5]We recognize that the harmless error standard is less stringent in the case of violations of nonconstitutional rules than it is for constitutional violations. See, e.g., United States v. Guzman, 167 F.3d 1350, 1353 (11th Cir. 1999) ("In cases of nonconstitutional error in criminal cases, we apply the federal harmless-error statute, which provides that on appeal we must ignore errors or defects which do not affect the substantial rights of the parties. 28 U.S.C. § 2111. In applying this test, we use the Kotteakos standard, which teaches that a nonconstitutional error requires reversal only if it resulted in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." (citations and quotations omitted)).

Under the circumstances of this case, the government has not carried its burden of proving that the unconstitutional continuation of trial in Rosell's absence was harmless beyond a reasonable doubt. In reaching the conclusion that the error was not harmless, we find important the particular parts of his trial that Rosell missed. Obviously, the more crucial the stage of trial, the less likely that a defendant's involuntary absence was harmless. On several occasions, this Court has found that a defendant's absence was harmless. See, e.g., United States v. Boyd, 131 F.3d 951, 953-54 (11th Cir. 1997) (finding harmless the defendant's absence during evidentiary hearing on motion for new trial); United States v. Brantley, 68 F.3d 1283, 1290-91 (11th Cir. 1995) (finding harmless defendant's unobjected-to absence during time when jury challenges were exercised); United States v. Harris, 908 F.2d 728, 739 (11th Cir. 1990) (finding harmless a defendant's short absence during closing argument where defendant had attorney present and did not object to proceeding); Hall v. Wainwright, 805 F.2d 945, 947-48 (11th Cir. 1986) (finding harmless defendant's absence during non-substantive portion of jury qualification and during brief colloquy between judge and jury during deliberations); United States v. Pepe, 747 F.2d 632, 652-54 (11th Cir. 1984)

---

Because this case involves violations of both constitutional provisions and a rule of criminal procedure, reversal is required unless the more exacting harmless error test is met.

50

(finding harmless defendant's absence during portion of James hearing on admissibility of co-conspirator hearsay evidence); Finney v. Zant, 709 F.2d 643, 645-46 (11th Cir. 1983) (finding harmless defendant's brief, voluntary absence during the examination of witnesses when the defendant went to the restroom).

None of those decisions, however, involved the absence of a defendant for the length of time involved in this case or during stages of a trial as critical as those missed by Rosell.[6]  Unlike the previous cases in which we found a defendant's absence to be harmless, Rosell was denied the opportunity to assist his attorney in the cross-examination of several witnesses put on by the government and by some co-defendants.  Rosell was unable to confront those witnesses in the courtroom and unable to observe the witnesses put on in his own defense or to suggest additional areas of inquiry his attorney might pursue with  any of the witnesses who testified during his involuntary absence.  He was also not present to discuss with his attorney whether additional witnesses should have been called.  Under these circumstances, we cannot say that the government has carried its burden of proving

---

[6]In fact, Finney appears to be the only case in which this Court found harmless a defendant's absence during the examination of witnesses.  709 F.2d at 646.  That case offers little support for the government's position because it involved only a brief absence during which the defendant went to the restroom, whereas this case concerns Rosell's absence during a portion of the government's case-in-chief as well as the entirety of the defense case.  Id.  Moreover, the Court in Finney concluded that the defendant's absence was voluntary.  Id.  For reasons we have already discussed, the same cannot be said about Rosell's absence.

51

that proceeding with the trial during Rosell's involuntary absence was harmless beyond a reasonable doubt.

Two arguments put forward by the government on this issue do merit some discussion. One is its argument that Rosell suffered no prejudice from his absence because his attorney was present at trial and represented his interests. As a panel of our predecessor court previously noted, "in many cases finding a defendant's involuntary absence at trial to have been harmless error, the court emphasizes the fact that while the defendant may have been absent, his attorney was present to protect his rights." United States v. Stratton, 649 F.2d 1066, 1080 (5th Cir. 1981). Although the presence of counsel is certainly a relevant factor to be considered in determining whether a defendant's absence was harmless, the right to be present at trial – grounded in the Confrontation Clause and the Due Process Clause – is not a gossamer right inevitably swept away simply because a defendant is represented, in his absence, by counsel. The right to be present is distinct from the right to be represented by counsel. The right to be present would be hollow indeed if it was dependent upon the lack of representation by counsel. Furthermore, such a rule would ignore the fact that a client's active assistance at trial may be key to an attorney's effective representation of his interests.

Second, the government argues that Rosell has made an insufficient showing

of prejudice, because he "does not point to any issue that his counsel did not raise

relevant to his defense." This argument, like the one we have just discussed,

devalues the constitutional right to be present, and ignores the assistance that a

defendant can provide to his counsel during trial. If we were to require that a

defendant show with specificity how his presence might have changed the course

or outcome of a trial, then the right to be present would cease to exist in many

cases in which the evidence of guilt is strong. The right to be present at one's own

trial is not that weak. And, of course, the government's argument would transfer

the burden on the prejudice issue from it to the defendant. For these reasons,

Rosell's rights under the Confrontation Clause, the Due Process Clause, and Rule

43 were violated by continuation of the trial over his protests while he was

involuntarily absent during critical stages of the trial, and the government has not

proven that the violations were harmless beyond a reasonable doubt. Accordingly,

we remand for a new trial.

## E. THE BATSON CHALLENGE

Mercedes Novaton, Rosell, Jorge Lopez, Matamoros, Cuni, Reynaldo

Rodriguez, and Leopoldo Rodriguez argue that the government violated the Equal

Protection Clause by using its peremptory challenges in a racially discriminatory manner. See Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986). During jury selection, the government used six of its eight peremptory challenges to strike Hispanic jurors (the government did not exercise its other two challenges).[7] At the time that the government exercised its peremptory challenges, most or all of the appellants objected on Batson grounds. They argued to the district court that the government was striking Hispanic jurors because the appellants were of Hispanic descent. The district court rejected the appellants' Batson challenges, concluding that the appellants had not made a prima facie showing given that several Hispanic jurors were accepted by the government and that the appellants themselves had exercised peremptory challenges against Hispanic jurors. Nonetheless, the court permitted the government to offer a race-neutral explanation for each of its peremptory strikes if it chose to do so, and the government took the court up on its offer.

The government proffered race-neutral explanations for each of the six peremptory challenges it exercised. With respect to the first juror that the government struck, Ms. Jarp, the government had attempted to have her removed

[7]There is some confusion in the record concerning whether one of the jurors struck by the government, Ms. Michelsen, was Hispanic. We will assume that she was.

for cause because of her difficulty understanding English. When asked by the court whether she understood what was being said, Ms. Jarp had responded: "Like I said, for me it is a little hard because I don't speak the language very well as everybody else," although she stated that she did not think that she had problems understanding the proceedings. The court declined to strike her for cause, and the government exercised its peremptory challenge. To explain its peremptory challenge of a second juror, Ms. Mason, the government stated that the juror had indicated that her son had been wrongfully arrested for possession of cocaine.

Next, the government struck Ms. Orsatelliz. The stated reason was that she was a social worker employed by Health and Rehabilitative Services. The government's fourth peremptory challenge was used against Ms. Michelsen. There was confusion among the attorneys as to whether Ms. Michelsen was Hispanic. The government stated that it had no knowledge of her being Hispanic, but certain defense attorneys stated that she was. The government said that although it did not know whether Ms. Michelsen was Hispanic, it would provide its race-neutral explanation, which is that Ms. Michelsen had previously accompanied a criminal defendant to his sentencing in order to hold his hand and give moral support.

The government's fifth peremptory strike was used against Ms. De La Roca. When challenged, the government explained that it struck Ms. De La Roca because she was friends with one of the defense attorneys, knew another defense attorney, and had previously worked for a judge who was prosecuted by federal authorities. The defense attorney with whom Ms. De La Roca claimed to be friends stated that although he knew her, he did not consider her a friend. Finally, the government struck Mr. Saenz. The government explained that "[t]he basis for the Government's striking of Mr. Saenz [was] his age, lack of life experience, and the fact that when asked . . . [about] the influence of narcotics indicated he had friends who 'smoked weed.'" Satisfied with the government's race-neutral explanations for all of its peremptory challenges, the district court denied the appellants' Batson motion.

## 1. Standard of Review

"A district court's findings regarding whether a peremptory strike was exercised for a discriminatory reason largely involve credibility determinations and are therefore entitled to great deference. Thus, we review a district court's findings in this respect only for clear error." United States v. Tokars, 95 F.3d 1520, 1530 (11th Cir. 1996) (citation omitted).

## 2. The Batson Framework

In <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712 (1986), the Supreme Court recognized that a prosecutor violates a defendant's equal protection rights when he or she uses peremptory challenges in a racially discriminatory manner in order to strike from the petit jury members of the defendant's race. Courts evaluate <u>Batson</u> objections under the following three-step procedure:

> (1) the objector must make a <u>prima facie</u> showing that the peremptory challenge is exercised on the basis of race; (2) the burden then shifts to the challenger to articulate a race-neutral explanation for striking the jurors in question; and (3) the trial court must determine whether the objector has carried its burden of proving purposeful discrimination.

<u>United States v. Allen-Brown</u>, 243 F.3d 1293, 1297 (11th Cir. 2001).

Our cases hold that "the establishment of a <u>prima facie</u> case is an absolute precondition to further inquiry into the motivation behind the challenged strike." <u>Central Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co., Inc.</u>, 236 F.3d 629, 636 (11th Cir. 2000). "[T]he party objecting to a peremptory strike bears the burden of establishing facts sufficient to support an inference of racial discrimination." <u>Id.</u> However, "the trial court should consider all relevant circumstances" in determining whether a <u>prima facie</u> case of discrimination has been established. <u>Batson</u>, 476 U.S. at 96-97, 106 S. Ct. at 1723. Such circumstances include whether there is a "pattern" of strikes against jurors of a certain race, and the questions asked by the prosecutor during voir dire. <u>Id.</u> at 97, 106 S. Ct. at 1723.

57

This Court has cautioned, however, that "the mere fact of striking a juror or a set of jurors of a particular race does not necessarily create an inference of racial discrimination." Lowder Realty, 236 F.3d at 636. Instead, "[t]he number of persons struck takes on meaning only when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck." Id. at 636-37. The existence of a "substantial disparity between the percentage of jurors of one race struck and the percentage of their representation on the jury" may create such an inference of discrimination, whereas "the unchallenged presence of jurors of a particular race on a jury substantially weakens the basis for a prima facie case of discrimination in the peremptory striking of jurors of that race." Id. at 6338. "Courts reviewing the resolution of a Batson challenge give great deference to a district court's finding as to the existence of a prima facie case." Allen-Brown, 243 F.3d at 1296 (citations and quotations omitted).

If a prima facie case of discrimination is established, then the prosecution must proffer a race-neutral explanation for its strikes. The Supreme Court has stated that "[t]he second step does not demand an explanation that is persuasive, or even plausible." Purkett v. Elem, 514 U.S. 765, 767-68, 115 S. Ct. 1769, 1771

58

(1995). In explaining the language in Batson, the Court noted that "[w]hat [Batson] means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." Id. at 769, 115 S. Ct. at 1771. See also United States v. Cobb, 185 F.3d 1193, 1196 n.2 (11th Cir. 1999) ("Under Batson, the reason for a peremptory strike that is challenged on race grounds does not have to be 'valid' in any sense other than race-neutral, nor does it have to relate to the case being tried.").

After a race-neutral explanation is offered, a court must then determine whether an equal protection violation has occurred. It is during the "third step [of the Batson framework] that the persuasiveness of the justification [proffered by the prosecutor] becomes relevant – the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." Purkett, 514 U.S. at 768, 115 S. Ct. at 1771.

### 3. Application to This Case

It is somewhat unclear on this record whether the district court rejected the appellants' Batson objections based on their failure to establish a prima facie case, or whether it did so because, in light of all relevant circumstances including the government's race-neutral explanations for its strikes, it found that the appellants had not carried their burden of proving that the challenged strikes were purposely

59

discriminatory. When the appellants first raised the <u>Batson</u> issue, after the prosecution had exercised its first two strikes against Hispanic jurors, the court indicated that they had not established a <u>prima</u> <u>facie</u> case requiring a race-neutral explanation. Nonetheless, it allowed the government to proffer such an explanation, and the court indicated that it accepted the government's explanation. The court again indicated after the third strike that it did not believe that the government was obligated to offer an explanation. However, after the appellants made their later <u>Batson</u> objections, the court no longer voiced any opinions about whether or not a <u>prima</u> <u>facie</u> case of discrimination had been established or whether the government was obligated to proffer its race-neutral explanations. Instead, the court listened to those explanations, as well as the arguments made by the appellants' attorneys, and then overruled the objections.

We do not believe that the judge abused his discretion by finding that the first two or three strikes by the government did not require a response from the government. However, in light of the fact that the judge decided to hear the prosecution's explanations before ruling on the final <u>Batson</u> objections, and given that the court eventually stopped indicating that the government was not obligated to proffer those explanations, we will assume for purposes of this opinion that the district court found that the appellants had put forth a <u>prima</u> <u>facie</u> showing of

discrimination when all of the government's peremptory strikes were considered together. It is only an assumption, because whether the court actually did so is far from clear. We will further assume that the assumed finding of a prima facie case was correct.

Even assuming all of this, the appellants are not entitled to relief because the district court did not commit clear error by denying the appellants' Batson objections in light of the government's proffered, race-neutral explanations for its peremptory strikes as well as the other relevant circumstances. The appellants' contention that the government's explanations were pretextual concern only two of the strikes – those against Ms. De La Roca and Ms. Orsatelliz. The appellants point out that although the government said that it struck Ms. De La Roca because she was friends with one of the defense attorneys and had worked for a judge who had been federally prosecuted, another non-Hispanic juror who was not dismissed had worked as a clerk in the state criminal courts and stated that he knew "most of the people here." Furthermore, the appellants argue that even though Ms. Orsatelliz was dismissed because she was a social worker employed by the Health and Rehabilitative Services, and was therefore presumably "liberal," three other jurors who worked for the Dade County Department of Education had not been struck even though their employment could also indicate that they were liberal.

61

These arguments do not persuade us that the district court committed clear error in finding that the prosecution's strikes were non-discriminatory. We have recognized that "failing to strike a white juror who shares some traits with a struck [non-white juror] does not itself automatically prove the existence of discrimination." United States v. Stewart, 65 F.3d 918, 926 (11th Cir. 1995). That is certainly true where there are relevant differences between the struck jurors and the comparator jurors. Here there are such differences. Although a white juror who worked for the courts and knew the attorneys was not struck, the Hispanic juror with those traits who was struck also had the added problem, from the government's perspective, of having worked for a judge who had been prosecuted by the federal government. That additional aspect of the Hispanic juror's background could certainly lead a prosecutor to decide to exercise a peremptory strike against her, but not the other juror.

Similarly, the fact that three Department of Education employees were allowed to remain on the jury certainly does not indicate that the government lied when it said that the reason it struck another juror was that she was a social worker for another agency. The appellants have not shown that all reasonable prosecutors would have considered those positions equally "liberal."

Moreover, we note that the district court was free to consider all other relevant circumstances, such as the fact that the government left several Hispanic jurors unchallenged and that the appellants themselves exercised peremptory challenges to strike Hispanic jurors, in deciding whether the appellants had carried their burden of proving that the government had committed an equal protection violation. On this record, we conclude that the district court did not clearly err in reaching the conclusion that the government had not exercised its strikes in a manner that discriminated against Hispanics.

## F. THE FAILURE TO PERMIT CROSS-EXAMINATION OF AGENTS CONCERNING UNRELATED INVESTIGATIONS

Appellants Reynaldo Rodriguez, Humberto Rodriguez, Mercedes Novaton, Leopoldo Rodriguez, Rosell, and Lopez contend that the district court committed reversible error by granting the government's motions in limine precluding them from cross-examining some of the agents about certain matters. Although the motions concerned four different agents, the appellants' arguments on appeal are limited to the preclusion of cross-examination of two of them – Detective Paez and Agent Lucas. First, the appellants maintain that they should have been permitted to cross-examine Paez about his involvement in the "Miami River Cops Scandal." As a part of the investigation into that scandal, Paez had been suspended

with pay from the police force for a four-month period in 1987.  After the investigation, he was reinstated.  No criminal charges were ever brought against Paez in connection with the scandal, although he was formally reprimanded for failing to document a conversation with an informant.

The appellants argued to the district court that cross-examination of Paez concerning this matter should be permitted because it could show bias or a motive to lie on his part.  In particular, they argued that "Paez had a cloud over his head at the Miami Police Department [as a result of the Miami River Cops Scandal] and was motivated to clear himself by testifying against another alleged dirty cop." Furthermore, the appellants represented to  the district court that although Paez had been cleared six years before the trial in this case, they had information that there might be an ongoing investigation into the scandal, possibly implicating Paez. They believed that the government should have provided them with information concerning any such investigation, and that they should have been permitted to cross-examine Paez about it.

Second, the appellants argued to the district court that they should have been able to cross-examine Agent Lucas concerning an investigation that was pending against him at the time of trial.  Lucas was investigated by the DEA in July 1993 after the agency received a letter alleging that he had stolen twenty-three kilograms

of cocaine during a cocaine seizure. Lucas was cleared after the investigation. In June 1994, however, the same source that had written the letter made the same allegations about Lucas, and a second investigation was conducted. That investigation was pending when the trial in the trial of this case began.

After listening to the arguments of counsel, the district court granted the government's motions in limine to preclude cross-examination concerning the investigation of Paez and Lucas. The court felt that those investigations were "irrelevant, and even if [they were] relevant, [their] probative value is outweighed by [their] prejudice." The court also thought that the defendants had made an insufficient showing concerning the existence of an ongoing investigation into Paez's involvement in the Miami River Cops Scandal to permit cross-examination (or additional discovery) in that regard.

We review the district court's evidentiary decisions only for a clear abuse of discretion. United States v. Lankford, 955 F.2d 1545, 1548 (11th Cir. 1992). The parties basically agree on the framework applicable to the questions presented by the government's motions in limine. To the extent that the appellants sought to attack Paez's and Lucas' credibility, Rule 608(b) of the Federal Rules of Evidence controlled. That rule permits a party, under certain circumstances, to challenge the

65

credibility of a witness with questions concerning past acts reflecting on the witness' character for truthfulness. That rule provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness . . . .

Fed. R. Evid. 608(b).

Although Rule 608 provides a district court with discretion to admit such evidence, "Rule 403 circumscribes the court's discretion by requiring the court to weigh the probative value of the evidence against the danger of unfair prejudice from it." Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp., 37 F.3d 1460, 1464 (11th Cir. 1994). Rule 403 provides that: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

In addition to the rules of evidence, courts have long recognized that the Sixth Amendment's Confrontation Clause provides a criminal defendant with a right to cross-examine witnesses. This Court has stated that:

66

The district court's discretion in limiting the scope of cross-examination is subject . . . to the requirements of the Sixth Amendment. The right of confrontation guaranteed by the Sixth Amendment includes the right to cross-examination. Cross-examination has traditionally been allowed for the purpose of impeaching or discrediting the witness . In particular, the exposure of a witness' motivation in testifying has been labeled by the Supreme Court as an important function of the Sixth Amendment right to cross-examination.

Lankford, 955 F.2d at 1548 (citations omitted). Furthermore, "[c]ross-examination of a government 'star' witness is important, and a presumption favors free cross-examination on possible bias, motive, ability to perceive and remember, and general character for truthfulness." United States v. Phelps, 733 F.2d 1464, 1472 (11th Cir. 1984) (citation omitted). However, "the mere fact that [a defendant] sought to explore bias on the part of a prosecution witness does not automatically void the court's ability to limit cross-examination." United States v. Diaz, 26 F.3d 1533, 1540 (11th Cir. 1994). Instead, a defendant is only entitled to cross-examine a witness if "the information sought to be elicited [is] relevant." Id. (citations and quotations omitted); see also Phelps, 733 F.2d at 1472 (noting that cross-examination regarding potential bias "must be relevant").

In light of these standards, we believe that the district court acted well within its discretion in limiting the cross-examination of Paez and Lucas. First, with respect to Paez, the information which the appellants sought to elicit concerning

67

the Miami River Cops Scandal was inadmissible under Rules 608 and 403. We find the Ad-Vantage case instructive in this regard. In that case, we held that cross-examination concerning two investigations by the Florida Bar Association and Florida Institute of Certified Public Accountants into the witness' possible ethical violations, which had not resulted in sanction, were inadmissible under Rules 608(b) and 403. In reaching that conclusion, we noted that the types of "[a]cts probative of untruthfulness under Rule 608(b) include such acts as forgery, perjury, and fraud." Ad-Vantage, 37 F.3d at 1464. On the other hand, "[t]o infer untruthfulness from any unethical act 'paves the way to the exception which will swallow the Rule.'" Id. (citation omitted). We also reasoned that the fact no sanction had been imposed for the allegedly unethical conduct and the temporal remoteness of the investigations made the relevance of the information questionable. Id. Moreover, we held in Ad-Vantage that even if the cross-examination concerning the investigations of the ethical complaints was marginally relevant, it still should be excluded under Rule 403 because "[i]n these circumstances, when the allegations of wrongdoing were grave but no sanctions resulted, the danger was great that the jury would infer more from the investigation than was fairly inferable." Id.

68

The same reasoning applies in this case. The Miami River Cops Scandal occurred more than six years prior to the trial of this case. Paez was thoroughly investigated in connection with that scandal, but was never charged with any crime and only received a reprimand for failing to document a conversation with an informant. The conduct for which he was reprimanded does not indicate a lack of truthfulness. Given that the investigation was temporally remote from Paez's testimony in this case and that Paez's only sanction in connection with the scandal was completely unrelated to his character for truthfulness, we conclude that the district court properly concluded that it was irrelevant. Moreover, as in Ad-Vantage, we agree with the district court that any potential relevance of the information was substantially outweighed by the possibility of unfair prejudice, and that it was due to be excluded under Rule 403.

Likewise, the district court did not abuse its discretion when it limited the cross-examination of Agent Lucas. The insertion into the trial of unproven allegations that Lucas had stolen cocaine had the obvious potential to cause serious and unfair prejudice to the government. In light of the fact that Lucas was cleared during the first investigation and that the second investigation concerned the same allegations from the same source, information concerning those investigations

elicited during cross-examination would not have had much, if any, probative value.

Finally, the appellants have failed to show any basis for attributing bias to Lucas because of the investigations. They might have (but did not) suggest that he was trying to gain advantage in the investigation by pleasing the DEA and prosecutors. However, the jury knew that Lucas worked for the DEA and presumably factored in his allegiance to it when weighing his testimony. We do not believe that the existence of the investigation would have added anything (other than unfair prejudice) to the equation. Therefore, we conclude that the district court did not abuse its discretion by limiting the cross-examination of Lucas as it did under Rules 608(b) and 403 of the Federal Rules of Evidence.

## G. LAY OPINION TESTIMONY REGARDING THE USE OF CODE WORDS

Appellants Humberto Rodriguez, Cuni, Lopez, Mercedes Novaton, Rosell, Reynaldo Rodriguez, and Leopoldo Rodriguez challenge the district court's admission of testimony by some of the agents on the case concerning the use of code words by the defendants. At several points throughout the trial, the district court permitted law enforcement agents who had monitored the telephone wiretaps, as well as the supervisors of those agents, to testify concerning their understanding

of the meaning of certain words used by the defendants in the taped conversations. For example, agents testified that when the defendants used the phrases "fifteen year old girl" or "fifty year old grandmother," they were actually referring to fifteen and fifty kilogram quantities of cocaine.

Over the objection of the defendants, the district court found that such testimony was admissible under Fed. R. Evid. 701 as lay witness opinion testimony which was rationally based on the perceptions and experience of the agents. The defense maintained that the testimony was actually expert testimony governed by Fed. R. 702, which should not have been admitted because the prosecution had not laid the proper foundation to qualify the witnesses as experts and because, contrary to Fed. R. Crim. P. 16(a)(1)(E) and the court's pre-trial orders, the government had not identified those witnesses as experts or provided summaries of their testimony before trial.

Rule 701 provides the standards for determining when a lay witness may provide testimony in opinion form. That rule, at the time of this trial in 1994,[8] provided as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or

---

[8]Rule 701 was amended in 2000 to add subpart (c), which limits the admission of lay witness opinion testimony to testimony that is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Fed. R. Evid. 701. The appellants do not dispute that the testimony was "rationally based on the perception" of the witnesses, nor do they dispute that the testimony was "helpful" to the jury in understanding the witnesses' testimony or in determining "a fact in issue" in the case. Instead, the appellants argue that despite the satisfaction of each of the two prerequisites for admitting lay witness opinion testimony, the evidence should have been excluded because the testimony might also have been characterized as expert testimony subject to the requirements of Rule 702 because the agents' opinion testimony was based, in part, on their prior experiences.

The appellants' argument has superficial appeal because the agents' experiences in drug investigations could be viewed as the type of "specialized knowledge" falling under Rule 702. In fact, we have in the past affirmed the admission under Rule 702 of the expert testimony of a police officer interpreting "drug codes and jargon." United States v. Brown, 872 F.2d 385, 392 (11th Cir. 1989) (affirming admission of opinion that references to "paper," "candy," "dresses," related to the sale of cocaine). Also, at least one of our sister circuits has found that a district court committed error, albeit harmless, by admitting this

72

type of testimony as lay witness opinion testimony rather than expert opinion testimony. See United States v. Figueroa-Lopez, 125 F.3d 1241, 1244-46 (9th Cir. 1997).

However, we do not accept the appellants' position , because it is based on the erroneous assumption (at least with respect to the pre-amendment version of Rule 701) that because an expert could provide the type of testimony at issue, a lay witness cannot. Our case law is squarely to the contrary. In United States v. Myers, 972 F.2d 1566 (11th Cir. 1992), this Court made clear that a witness does not fall outside of Rule 701 simply because his or her "rational[] . . . perception" is based in part on the witness' past experiences. In Myers, the defendant, a former police officer charged with depriving arrestees of their civil rights by using a stun gun, challenged a district court's admission of testimony that "reddish burn marks on [a victim's] back were consistent with marks that would be left by a stun gun." Id. at 1577. Myers argued that testimony should not have been admitted under Rule 701 because it "went beyond the everyday common knowledge of a lay person." Id. This Court rejected his argument concluding that the witness's "conclusion was rationally based upon his personal perception of [the victim's] back and his nineteen years of experience on the police force." Id. We further noted that "[t]o the extent that [the witness's] opinion lacked a technical/medical

basis, [the defendant] had the opportunity to expose this on cross-examination," and the defendant's "objection to the evidence goes to its weight and not its admissibility." Id.; see also Agro Air Assocs., Inc. v. Houston Casualty Co., 128 F.3d 1452, 1455 (11th Cir. 1997) (affirming the admission of lay witness opinion testimony "based on the witnesses' personal observations and knowledge of, and experience in, the aviation industry"). Moreover, we have specifically held on a number of occasions that district courts did not abuse their discretion by permitting police officers to testify under Rule 701 about their understanding of the meaning of conversations by or with criminal defendants. For example, in United States v. Awan, we affirmed a district court's admission of testimony by an undercover agent concerning the "meaning and import" of statements that were part of tape-recorded conversations with the defendants. 966 F.2d 1415, 1430 (11th Cir. 1992). The defendants in that case argued that the jurors should have been permitted to reach their own conclusions about the meaning of the statements without the influence of the agent's interpretation. Id. We rejected that argument after finding that the agent's testimony was based on his perceptions of the conversations and that the testimony could have been helpful to the jury. Id. at 1430. See also United States v. Davis, 787 F.2d 1501, 1505 (11th Cir. 1986) (affirming admission of opinion under Rule 701 that when defendant stated that he

"wanted to make a trip," he was referring to an illegal act); United States v. Russell, 703 F.2d 1243, 1248 (11th Cir. 1983) (affirming admission of agents' testimony interpreting tape-recorded conversations with defendants).

In light of these decisions, we believe that the district court did not abuse its discretion by permitting agents involved in this case to give opinion testimony based on their perceptions and on their experience as police officers about the meaning of code words employed by the defendants in their intercepted telephone conversations. Moreover, the district court instructed the jury that the agents were not expert witnesses and that the jurors should independently determine the meaning of the statements. Also, each of the witnesses was subject to cross-examination by the appellants during which they challenged the agents' interpretations of the taped conversations. Under these circumstances, the appellants' objections go to the weight, rather than the admissibility, of the agents' testimony. See Myers, 972 F.2d at 1577. Therefore, the district court did not abuse its discretion.[9]

---

[9]Despite our conclusion, we note that it is an open question whether the amendments made to Rule 701 in 2000 might require a different result if the trial were held today. Those amendments limit lay witness opinion testimony to that which is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). The stated purpose behind the 2000 amendments was "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701, Advisory Committee Notes to 2000 amendments. It could well be that the experiences which provided the testifying agents with a

75

## H. CONFLICT OF INTEREST OF CUNI'S ATTORNEY

Cuni contends that the district court erred by denying his motion for a new trial or to dismiss the indictment based on an alleged conflict of interest by one of his trial attorneys. Cuni maintains that his attorney labored under a conflict of interest by continuing his representation of Cuni despite the possibility that he was being investigated by the same United States Attorney's Office in connection with a different case. Cuni states that his attorney did not inform him of the possible conflict and did not seek his consent to continue his representation. Cuni also argues that the government engaged in misconduct when it failed to inform the district court or the defendants of the potential conflict resulting from the investigation of Cuni's attorney. The district court rejected Cuni's arguments, concluding that there was no showing of an "actual conflict" between the interests of Cuni and his attorney, and also that Cuni's representation had not been "adversely affected" by any potential conflict.[10]

---

basis for rationally perceiving the information provided in their opinion testimony in this case would constitute "specialized knowledge," and that such testimony would now be admissible only under Rule 702. We leave that question for another day, however, because the district court did not abuse its discretion by admitting the agents' testimony under the version of Rule 701 in effect at the time of the trial in this case.

[10]"Questions involving conflicts of interest are mixed determinations of law and fact subject to de novo review." Porter v. Singletary, 14 F.3d 554, 561 (11th Cir. 1994).

The factual basis for Cuni's claim relates to the possible connection between one of his attorneys, Michael Blacker, and a conspiracy charged in an unrelated case in which Blacker was counsel for a different defendant (named Martin). On October 18, 1994, approximately three and a half weeks after the trial in this case began, Blacker was served with a bill of particulars in that case, and in it the Assistant United States Attorney indicated that:

> [I]n an abundance of caution and to the extent defendant MARTIN has not read the discovery, the government will restate those individuals, other than the charged co-conspirators, who may have furthered the objects of the conspiracy: . . . Michael Blacker.

The government maintains that despite this statement in the bill of particulars, Cuni's attorney did not have a conflict of interest because he was not under investigation by the United States Attorney's Office. In support of its position, the government provided a copy of notes taken by an attorney who represented Blacker during a June 1995 meeting with the Assistant United States Attorney. The notes indicate that Blacker's lawyer was advised during the meeting that Blacker was not a target of any investigation and that no indictment was contemplated against him. In light of these facts, and without the benefit of an evidentiary hearing, the magistrate judge recommended that Cuni's motion for a new trial or dismissal be denied, and the district court adopted that recommendation.

It is well-settled that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S. Ct. 1708, 1718 (1980). The Supreme Court noted in Cuyler that "a defendant who shows that a conflict of interest actually affected his representation need not demonstrate prejudice in order to obtain relief." Id. at 349-50, 100 S. Ct. at 1719. However, the Court emphasized that "the possibility of conflict is insufficient to impugn a criminal conviction," and that absent a showing of actual conflict and adverse effect, a defendant is not entitled to relief. Id. at 350, 100 S. Ct. at 1719. Therefore, the Supreme Court has noted that there is no "per se rule of prejudice" in all cases involving potential conflicts of interest, but instead only a rule of presumptive prejudice where an attorney "'actively represented conflicting interests' and . . . 'an actual conflict of interest adversely affected [the] lawyer's performance.'" Strickland v. Washington, 466 U.S. 668, 692, 104 S. Ct. 2052, 2067 (1984) (citation omitted).

In Freund v. Butterworth, 165 F.3d 839 (11th Cir. 1999) (en banc), this Court discussed the two-part Cuyler test for reviewing claims involving conflicts of interest. First, we noted that "[a]n 'actual conflict' of interest occurs when a

78

lawyer has 'inconsistent interests.'" Id. at 859 (citations omitted). The Court stated

that:

> In order to prove that an "actual conflict" hindered [the defendant's]
> lawyer's performance, [the defendant] "must make a factual showing
> of inconsistent interests" or point to "specific instances in the record"
> to suggest an actual impairment of his or her interests. Overall, the
> "actual conflict" inquiry is fact-specific, consistent with the
> [defendant's] ultimate burden "to prove that his conviction was
> unconstitutional."

Id. (citations and quotations omitted). If a defendant is unable to show an "actual

conflict," then he is not entitled to relief from his conviction because a "speculative

or merely hypothetical conflict of interest does not yield a Sixth Amendment

violation." Burden v. Zant, 24 F.3d 1298, 1305 (11th Cir. 1994).

If a defendant carries his burden of showing an actual conflict of interest, a

court must then consider whether the conflict adversely affected his representation.

In Freund, we summarized the "adverse effect" inquiry as follows:

> To prove adverse effect, a [defendant] must satisfy three elements.
> First, he must point to some plausible alternative defense strategy or
> tactic [that] might have been pursued. Second, he must demonstrate
> that the alternative strategy or tactic was reasonable under the facts.
> Because prejudice is presumed, the [defendant] need not show that
> the defense would necessarily have been successful if [the alternative
> strategy or tactic] had been used, rather he only need prove that the
> alternative possessed sufficient substance to be a viable alternative.
> Finally, he must show some link between the actual conflict and the
> decision to forgo the alternative strategy of defense. In other words,
> he must establish that the alternative defense was inherently in

conflict with or not undertaken due to the attorney's other loyalties or interests.

Freund, 165 F.3d at 860 (citations and quotations omitted). In the absence of a showing of an "adverse effect," prejudice is not presumed to flow from a conflict of interest. Id.

Applications of these standards to the facts of this case reveal that Cuni is not entitled to relief based on the alleged conflict of interest. First we consider whether an "actual conflict" has been shown. As we noted in Freund, the inquiry into the existence of an actual conflict is "fact-specific." 165 F.3d at 859. Based on the evidence in the record, we cannot determine whether or not an "actual conflict" existed. The only evidence that the district court had before it on the issue was the bill of particulars indicating that Blacker might be an unindicted co-conspirator, and the representation, based on Blacker's attorney's notes from a meeting that occurred over six months after the end of the trial in this case, that Blacker was not a target of any investigation and was not expected to be indicted. We believe that this information was insufficient to permit the court to find that no actual conflict existed. In particular we note that reliance on the notes from the June 1995 meeting between Blacker's attorney and the Assistant United States Attorney are not persuasive because they apparently reflect only information that was given to Blacker after the conclusion of Cuni's trial in this case. Those notes

80

do not indicate that no conflict existed earlier that should have been disclosed to Cuni and the district court.

Nonetheless, even if we assume that an actual conflict of interest existed between Cuni and his attorney, we agree with the district court's alternative holding that Cuni has not, and cannot, show his attorney's performance was "adversely affected" by the conflict. Cuni has made absolutely no showing of any adverse effect resulting from his attorney's alleged conflict of interest, much less any "plausible alternative defense strategy or tactic" that was "reasonable under the facts." See Freund, 165 F.3d at 860 (citations and quotations omitted). The closest Cuni comes to articulating any adverse effect is a statement that he would have dismissed his attorney if he had been informed of the possible conflict, and a conclusory allegation that his attorney absented himself from the trial in this case in order to defend his own interests in the case in which he was named as a possible, unindicted co-conspirator. While the latter allegation might be a cause for concern if there were any factual basis supporting it, there is none.

Moreover, our own review of the record convinces us that Cuni's representation was not adversely affected by the possible conflict of interest. As the magistrate judge pointed out, "[t]his record is replete with examples of vigorous and relentless[] attacks by Blacker on the government's case and its

81

agents." In particular, Blacker argued that Agent Lucas, the agent who filed affidavits in support of the various wiretaps, made intentional or reckless misrepresentations in support of the applications. Blacker also challenged the competence of the agents who monitored the wiretaps, and argued that those agents misunderstood the recorded statements. We agree with the magistrate judge that this aggressive approach could hardly be seen as an effective way for an attorney to curry favor with the government.[11] Therefore, we conclude that Cuni has failed to show any "adverse effect" from the alleged conflict of interest entitling him to relief from his conviction.

Our opinion in United States v. McLain, 823 F.2d 1457 (11th Cir. 1987), on which Cuni heavily relies, does not require a different result. In McLain, we found that a defendant's Sixth Amendment rights were violated when his attorney had a conflict of interest because the same prosecutor was investigating that attorney on an unrelated matter. 823 F.2d at 1463. After noting that an attorney has an ethical obligation to inform his or her client about any potential conflict of interest, we considered whether the attorney's performance in that case was adversely affected by the conflict of interest. Id. at 1464. We found that "[t]here [was] substantial

---

[11]We note that Cuni had an additional attorney at trial, Mr. Villalobos, who did not suffer from any conflict of interest. The presence of co-counsel unaffected by the alleged conflict of interest makes it even less likely that Cuni's representation was adversely affected by the alleged conflict.

82

evidence that the United States attorney would not attempt to indict [the attorney] until [his client's] trial ended," and noted that this created an incentive for the attorney to forego plea bargain negotiations and to prolong the trial. Id. We also found that the attorney's conflict of interest affected his efforts to negotiate a plea bargain in several other specific respects. Id. These specific instances of "adverse effects" resulting from the conflict of interest distinguish McLain from this case. As we have already discussed, nothing in the record of this case suggests that Cuni's representation was affected in any way by the alleged conflict. Therefore, we reject this contention.[12]

## I. SUFFICIENCY OF EVIDENCE SUPPORTING JORGE LOPEZ'S FIREARMS CONVICTION

Appellant Jorge Lopez challenges the sufficiency of the evidence to convict him of carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). Lopez, a former police officer, admits that he carried his service firearm during the events involved in this case, but argues that

---

[12]Although we conclude that Cuni's attorney provided him with adequate representation which was unaffected by the alleged conflict of interest, we note that it would certainly have been preferable for the attorney, as well as the prosecution, to inform Cuni and the district court of the circumstances surrounding the potential conflict of interest. Under the facts of this case, however, their failure to do so did not amount to a violation of the Sixth Amendment.

there was no evidence to suggest that he "employed the firearm or intended to employ the firearm in furtherance of any object or goal of the charged conspiracy."

In Smith v. United States, 508 U.S. 223, 113 S. Ct. 2050 (1993), the Supreme Court addressed the meaning of the requirement that a firearm be used "during and in relation to" a "crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1). The Court noted that "[t]he phrase 'in relation to' is expansive," Smith, 508 U.S. at 237, 113 S. Ct. at 2058, but the Court also said that the phrase, "at a minimum, clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." Id. at 238, 113 S. Ct. at 2058-59. In other words, the "gun at least must 'facilitate, or have the potential of facilitating,' the drug trafficking offense." Id. at 238, 113 S. Ct. at 2059 (citation and brackets omitted).

Viewing the evidence in the light most favorable to the government, as we must when reviewing the sufficiency of the evidence supporting a conviction, see United States v. Leonard, 138 F.3d 906, 908 (11th Cir. 1998), we have no trouble concluding that there was sufficient evidence to support Lopez's conviction for the § 924(c) offense. There was evidence that Lopez, while armed, furthered the drug trafficking conspiracy by providing protection for and escorting co-conspirators to

84

and from the Novaton residence while they were transporting drugs or drug proceeds. In light of that evidence, it was certainly reasonable for the jury to conclude that Lopez used his weapon, albeit a police-issued service firearm, "in relation to" the drug conspiracy and that his carrying the weapon facilitated, or had the potential for facilitating, the co-conspirators' drug trafficking. Therefore, we reject Lopez's sufficiency of the evidence argument.

## J. THE FIREARM SENTENCING ENHANCEMENTS

The appellants, with the exception of Lopez, contend that the district court erred by applying a two-level enhancement to their base offense levels under the sentencing guidelines based on Lopez's possession of a firearm. See U.S.S.G. § 2D1.1(b)(1). The appellants argue that the district court erred because, they maintain, it was not reasonably foreseeable that Lopez's possession of a firearm was in furtherance of the conspiracy in that Lopez was required to carry his firearm because he was a police officer. That argument, essentially, is the same one that we have just rejected when it was made in the form of Lopez's sufficiency of the

evidence contention. For the same reasons we discussed there, we reject the argument here, as well.[13]

Some of the appellants also challenge this enhancement on the grounds that the district court failed to make a specific factual finding that the appellants could reasonably foresee Lopez would possess a gun during the conspiracy. On numerous occasions, this Court has found that the § 2D1.1(b)(1) firearm enhancement may be applicable to a defendant based on the possession or use of a weapon by a co-conspirator. See, e.g., United States v. Otero, 890 F.2d 366 (11th Cir. 1989). However, at the time that the district court sentenced the appellants, it was not entirely clear whether the co-conspirator's possession of the weapon must have been reasonably foreseeable to a defendant, and the district court did not make such a finding in this case. In United States v. Gallo, 195 F.3d 1278 (11th Cir. 1999), we clarified that in light of the requirements of U.S.S.G. § 1B1.3(a)(1)(b), which concerns sentence enhancements based on co-conspirator conduct, a district court must find that the "co-conspirator possession [of a

---

[13]This Court recently reached the same conclusion in a factually similar case in which a firearm enhancement was made based on the possession of a service weapon by an INS inspector who participated in a drug conspiracy. See U.S. v. Audain, 254 F.3d 1286, 1290 (11th Cir. 2001). In that case, we held that the defendant had not carried his burden of proving that it was "clearly improbable" that the presence of the weapon was relevant to the offense. Id. Audain supports our conclusion, discussed above, that Lopez's weapon facilitated, or had the potential of facilitating, the crime of drug trafficking, and supports the application of the firearm enhancement to the other appellants in this case.

dangerous weapon] was reasonably foreseeable by the defendant." Id. at 1284.

Therefore, we held that:

> [F]or a § 2D1.1(b)(1) firearms enhancement for co-conspirator possession to be applied to a convicted defendant, the government must prove by a preponderance of the evidence: (1) the possessor of the firearm was a co-conspirator, (2) the possession was in furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of possession, and (4) the co-conspirator possession was reasonably foreseeable by the defendant.

Id.

Although several of the appellants argue that the district court erred by not making a specific finding as to the foreseeability that Lopez would possess a weapon, the only one to object on this basis in the district court was Rosell.[14] Because we have found that Rosell is entitled to a new trial on other grounds, any error with respect to his sentence is irrelevant. Because the other appellants did not object in the district court, we consider only whether the district court's failure to make a factual finding in this regard was plain error. See United States v. Gallego, 247 F.3d 1191, 1196 (11th Cir. 2001). We have explained that:

> The four prongs of plain error review are: (1) there must be error; (2) the error must be plain; (3) the error must affect the appellant's substantial rights; and (4) the error must "seriously affect[ ] the

---

[14]In its brief, the government indicates that Humberto Rodriguez also objected on this basis. However, a review of the sentencing transcript reveals that his objection only concerned the foreseeability that Lopez's weapon was possessed or used in furtherance of the conspiracy, and not the foreseeability that Lopez possessed a weapon in the first place.

> fairness, integrity, or public reputation of judicial proceedings."
> Before we may correct an error that was not timely raised, all four
> prongs must be satisfied.

Id. (citations and quotations omitted).

Under plain error review, none of the appellants are entitled to relief from the sentences imposed by the district court. Even if we assume that the district court erred by not making a finding concerning the foreseeability of Lopez's possession of a firearm and that the error was plain, the appellants cannot satisfy the third prong of the plain error test. In light of the ample evidence concerning Lopez's possession of his service firearm and the appellants' awareness of that possession, they cannot show that their substantial rights were affected by the lack of a specific finding. The fact that their arguments below focused on the lack of foreseeability that Lopez's weapon would be used in furtherance of the conspiracy, rather than on the lack of foreseeability of his possession of the weapon to begin with, indicates that their knowledge of his possession of the weapon was not in dispute. Under these circumstances, we find no plain error. Therefore, we affirm the district court's enhancement of the appellants' sentences pursuant to U.S.S.G. § 2D1.1(b)(1).

### K. CUNI'S CAREER OFFENDER ENHANCEMENT

Cuni's contends that the district court had no jurisdiction to enhance his sentence pursuant to 21 U.S.C. § 851 because of the timing of the government's service of its notice of intent to seek that enhancement. The parties are in agreement that the prosecution must file and serve its notice of intent to seek a § 851 enhancement prior to the commencement of trial. The only dispute is whether the government's service of notice in this case was timely.

The facts relevant to this issue are not in dispute. The government filed its notice of intent to seek a § 851 career offender enhancement on the day before trial commenced, and mailed the notice to Cuni's attorney on the same day. If service was complete on the day that the notice was mailed, then the notice was timely and the district court had jurisdiction to enhance Cuni's sentence pursuant to § 851. If, however, service was only completed sometime later, then the notice was untimely and the district court had no jurisdiction to enhance Cuni's sentence. See Harris v. United States, 149 F.3d 1304, 1306 (11th Cir. 1998) (noting that "a district court lacks jurisdiction to enhance a sentence unless the government strictly complies with the procedural requirements of § 851(a)").

Cuni argues that the method for determining when service was complete is controlled by Fed. R. Crim. P. 45(e), which provides, in relevant part, that:

> Whenever a party has the right or is required to do an act within a
> prescribed period after the service of a notice or other paper upon that

89

> party and the notice or other paper is served by mail, 3 days shall be added to the prescribed period.

Fed. R. Crim. P. 45(e).  Cuni's position is that Rule 45 requires us to add three days to the effective date of service of the notice, which would make it untimely.

The government, on the other hand, maintains that Fed. R. Crim. P. 49 controls our determination.  Rule 49 provides that service should be made on a criminal defendant's attorney "in the same manner provided in civil actions."  The relevant civil rule, Fed. R. Civ. P. 5(b), states:

> Whenever under these rules service is required or permitted to be made upon a party represented by an attorney the service shall be made upon the attorney unless service upon the party is ordered by the court. Service upon the attorney or upon a party shall be made by delivering a copy to the attorney or party or by mailing it to the attorney or party at the attorney's or party's last known address or, if no address is known, by leaving it with the clerk of the court. . . . Service by mail is complete upon mailing.

The government argues that its § 851 notice was timely pursuant to these rules, because it was mailed the day before trial, and service was complete on that day.

We find Cuni's argument, premised on Fed. R. Crim. P. 45(e), unpersuasive for two closely related reasons.  First, by its terms, Rule 45 only applies in situations in which a defendant "has the right or is required to do an act within a prescribed period after the service of a notice."   However, although § 851 provides that a defendant may file a response to the prosecution's notice denying the

90

allegations, <u>see</u> 21 U.S.C. § 851(c), it does not prescribe a period in which that response must be filed.  Therefore, by its own terms, Rule 45 is inapplicable in this context.  Second, even if Cuni had been required to file a response within a certain period, Rule 45 would operate only to extend the period for filing; it would not affect the date on which service on Cuni was complete.  Rule 45 does not address when service is complete.

But Rule 49 (b), in conjunction with Fed. R. Civ. P. 5(b), does address  when service of a § 851 notice is complete.  Those rules clearly state that such "[s]ervice by mail is complete upon mailing."  That means that service of the government's § 851 notice in this case was completed the day before the trial began, in conformance with the procedural requirements of 21 U.S.C. § 851(a)(1).  Therefore, the district court had jurisdiction to enhance Cuni's sentence.

## L.  THE APPELLANTS' <u>APPRENDI</u> CHALLENGES

Each of the appellants contends that his or her sentence runs afoul of the Supreme Court's decision in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348 (2000).  Because none of the appellants raised timely constitutional objections on the <u>Apprendi</u> issues, our review of these claims is limited to  plain

91

error.[15]  See United States v. Candelario, 240 F.3d 1300, 1308 (11th Cir. 2001).

The usual four-prong plain error test applies to Apprendi issues.  See id.

The first two steps of plain error review concern whether there is error and, if so, whether it is plain.  In the context of drug cases under 21 U.S.C. § 841, our decisions have held that sentencing a defendant in excess of twenty years (the statutory maximum under § 841(b)(1)(C) absent a finding concerning drug quantity) without a quantity determination by the jury constitutes "error" for purposes of plain error review, and that the error is "'plain' even though the law was different at the time of the defendant's conviction and sentencing." Candelario, 240 F.3d at 1309.  On the other hand, sentencing a defendant to twenty years or less without such a determination is not error, plain or otherwise, under Apprendi.  See United States v. Gerrow, 232 F.3d 831, 834 (11th Cir. 2000).

Application of the first two prongs of the plain error review to the facts of this case defeats the Apprendi challenges of four of the appellants.[16]  Appellants

---

[15]"The four prongs of plain error review are: (1) there must be error; (2) the error must be plain; (3) the error must affect the appellant's substantial rights; and (4) the error must 'seriously affect[ ] the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Gallego, 247 F.3d 1191, 1196 (11th Cir. 2001) (quoting Johnson v. United States, 520 U.S. 461, 467, 117 S. Ct. 1544, 1549 (1997)).

[16]The same is true with respect to Francisco Novaton's sentence on his conviction for operating a continuing criminal enterprise in violation of 21 U.S.C. § 848.  Because that provision provides for a statutory maximum sentence of life imprisonment, Novaton's 30 year sentence on that count does not violate Apprendi.  Nonetheless, we will assume for present purposes only that the issue of  whether Novaton's concurrent 30 year sentence on each of the

Mercedes Novaton, Jorge Lopez, Leopoldo Rodriguez, and Ramon Rosell were each sentenced to less than twenty years with respect to their convictions under 21 U.S.C. § 841 or 21 U.S.C. § 846.[17]  Therefore, under Gerrow none of their sentences violate Apprendi.  The sentences for each of the other five appellants, however, exceeds the twenty-year threshold, and imposing those sentences without a drug quantity determination by the jury constitutes error that is plain. (The indictment alleged only a detectible quantity of cocaine.)  As to the sentences of those five appellants, we must  proceed to the third prong of the plain error analysis.

The third prong of plain error analysis is the one that has proved most difficult for defendants pressing Apprendi issues.  This prong "asks whether the error affected the defendant's substantial rights."  Candelario, 240 F.3d at 1310.  See also Fed. R. Crim. P. 52(b).  In several cases we have found that a defendant's substantial rights were not affected where a rational jury could not have found the defendant guilty of the drug offense without also finding beyond a reasonable

other counts in the indictment violate Apprendi remains viable.

[17]The drug conspiracy statute under which each of the appellants was convicted, 21 U.S.C. § 846, incorporates the penalty provisions applicable to the object of the conspiracy, in this case 21 U.S.C. § 841.  Therefore, the Apprendi analysis of conspiracy convictions in this case is identical to the analysis applicable to substantive possession counts brought under 21 U.S.C. § 841.

doubt that the offense involved a quantity of drugs sufficient to increase the statutory maximum to where it is equal to or greater than the defendant's sentence. See e.g., United States v. Swatzie, 228 F.3d 1278, 1282-83 (11th Cir. 2000). Put another way, "[w]e must affirm [a] Defendant's sentence if the record does not contain evidence that could rationally lead to a contrary finding with respect to drug quantity." United States v. Nealy, 232 F.3d 825, 830 (11th Cir. 2000).

To apply this approach, we must first determine the minimum quantity of drugs which a jury must have found beyond a reasonable doubt to be involved in the substantive offense in order to bring the defendant's sentence within the statutory maximum. The requisite drug quantity is determined by reference to § 841's three penalty provisions. As mentioned above, § 841(b)(1)(C) has no quantity requirement, and permits a sentence up to twenty years for offenses involving any detectable quantity of cocaine. For offenses involving 500 grams or more of cocaine, § 841(b)(1)(B) applies and permits a sentence of not less than five years and not more than forty years. Finally, if the offense involves five kilograms or more of cocaine, § 841(b)(1)(A) permits a sentence from ten years to life.[18]

_____

[18]Each of the subdivisions of § 841(b)(1) provides for a higher range of penalties if certain factors are present, such as a prior felony drug conviction, but consideration of those factors are not relevant to our analysis in this case, because the analysis yields the same result regardless of whether they are considered.

94

Application of the third prong of the plain error analysis in light of § 841's penalty provisions yields the following results. If a defendant's sentence exceeded twenty years, but was less than forty years, the defendant's substantial rights were not affected unless the defendant shows an evidentiary basis on which the jury that found the defendant guilty also could have rationally found that the quantity of cocaine involved was less than 500 grams. If a defendant's sentence exceeded forty years, the defendant's substantial rights were not affected unless the defendant shows an evidentiary basis on which the jury that found the defendant guilty also could have rationally found that the quantity of cocaine involved was less than five kilograms.

Appellants Francisco Novaton, Matamoros, Humberto Rodriguez, and Reynaldo Rodriguez were each sentenced to terms of imprisonment between twenty and forty years. Therefore, in order to show an effect on their substantial rights, each must show that there was evidentiary basis on which the jury that convicted him rationally could have found that the offense involved less than 500 grams of cocaine. As for Cuni, who received a life sentence, he must point to an evidentiary basis on which the jury could have found that the offense did not involve at least 5 kilograms of cocaine.

95

Francisco Novaton, Matamoros, Humberto Rodriguez, and Reynaldo Rodriguez have not pointed to any evidentiary basis, and the record shows there was none, for the jury to have found that the offenses for which they were convicted involved less than 500 grams of cocaine. The same is true as to Cuni and the five kilogram minimum for the life sentence maximum. No evidence indicated that cocaine was ever trafficked by these conspirators in any amount less than a kilogram. For example, the three drug seizures related to this conspiracy were in the amounts of three kilograms, four kilograms, and eight kilograms. Furthermore, the only evidence concerning Count 5 of the indictment, of which Francisco Novaton, Cuni, and Humberto Rodriguez were each convicted, indicated that the transaction involved sixty-five kilograms of cocaine. During their sentencing hearings, each of the appellants challenged the district court's drug quantity determinations, but none suggested that the conspiracy involved less than 500 grams of cocaine. And Cuni's counsel conceded to us during oral argument that the jury could not have convicted him of the counts on which he was found guilty without necessarily finding that the quantity of cocaine involved exceeded five kilograms. Because of the complete absence of any evidence which would have permitted the jury to conclude that any of the offenses for which the appellants were convicted involved less than the amount necessary to kick in the statutory

96

maximum equal to or higher than the sentences imposed upon them, none of their substantial rights were affected by any <u>Apprendi</u> error. [19]

### III. CONCLUSION

For the foregoing reasons, we REVERSE and REMAND the conviction of Appellant Ramon Rosell.  We also REMAND the case insofar as Appellant Reynaldo Rodriguez is concerned in order for the district court:  to attempt to reconstruct any missing exhibits introduced at trial which are relevant to his claim that the court erred by not allowing him to introduce impeachment evidence pursuant to Fed. R. Evid. 806;  to decide that Rule 806 issue involving him; and to decide  any related issues stemming from the missing exhibits that are relevant to the Rule 806 issue  Reynaldo Rodriguez has raised.  In all other respects, we AFFIRM the convictions and sentences of all the appellants.

---

[19]Because we conclude that no appellant's substantial rights were affected by any <u>Apprendi</u> error, we will not consider the fourth prong of the plain error analysis.